## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTH DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| JOHN DOE, *on behalf of himself and all others similarly situated*, | Case No. 1:25-cv-01765 |
| Plaintiff, | |
| v. | |
| OHIO MEDICAL ALLIANCE LLC d/b/a OHIO MARIJUANA CARD, | **CLASS ACTION COMPLAINT** |
| Defendant. | **JURY TRIAL DEMANDED** |

John Doe[1] ("Plaintiff"), through his attorneys, on behalf of himself and all others similarly situated, brings this Class Action Complaint against OHIO MEDICAL ALLIANCE LLC, doing business as OHIO MARIJUANA CARD ("OMA" or "Defendant"), alleging as follows, based upon information and belief, investigation of counsel, and personal knowledge of Plaintiff.

### INTRODUCTION

1.      Recently,  a cybersecurity researcher discovered a publicly exposed database that contained 957,434 records, with a total size of 323 GB, belonging OMA (the "Cybersecurity Incident.")

2.      The publicly exposed database was not password-protected or encrypted, despite the fact it contained highly sensitive private identifying information ("PII") and private health information ("PHI") belonging to an unknown number of patients and internal employees or business partners.

3.      The  publicly  available  database  included  high-resolution images  of  driver's

---

[1] Plaintiff brings this action pseudonymously to protect his privacy interest in relation to his Private Health Information, and will file a motion for leave to proceed in this manner without delay.

licenses or identification documents that contained names, physical addresses, DOB, and license numbers, as well as complete copies of debit and credit cards. The folders were labeled with the first and last names of the patients and contained intake forms, medical records, release forms, physician certification forms with SSNs, mental health evaluations, and identification documents from multiple states. These medical documents indicated the patients' diagnosis and the reason they were seeking to be prescribed medical marijuana.

4.      The publicly available database also contained a large amount of internal communications, notes about clients, appointments, status, or personal situations—including an estimated 210,620 email addresses of clients and internal employees or business partners.

5.      According to OMA's privacy statement, it claims that all patient information is kept confidential in their HIPAA-compliant file storage system. These representations are false.

6.      The publicly displayed records could potentially create serious privacy and security risks in the wrong hands. The publicly exposed records contain detailed personal and health information that could potentially be exploited for harassment or extortion attempts.

7.      Likewise, marijuana remains illegal under federal law, and medical or recreational marijuana use is something that many people would want to remain private. Similarly, mental health is a deeply private issue that could be stigmatized by employers, friends, or family once publicly exposed.

8.      Aside from PHI, highly sensitive PII was also publicly available for an unknown amount of time, including Social Security Numbers. Social Security Numbers, especially when combined with the other categories of PII that were publicly available, increases the risk for identity theft or financial fraud.

9.      The cybersecurity researcher who discovered the database immediately sent notice to OMA, and although OMA did not reply or notify its patients, the database was restricted from public access the following day. It is not known how long the database was exposed before the researcher discovered it.

10.     According to their website, OMA has helped over 340,000 patients nationwide access medical marijuana. The company operates clinics in Ohio, Arkansas, Kentucky, Louisiana, Virginia, and West Virginia. Therefore, there are likely thousands of victims of OMA's gross negligence.

11.     Defendant's deliberate failure to timely report the public exposure of its patients' and employees' PII/PHI made the victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their PII/PHI.

12.     Defendant knew or should have known that each victim of its gross negligence deserved prompt and efficient notice of the Cybersecurity Incident, as well as assistance in mitigating the effects of PII/PHI misuse.

13.     In failing to adequately protect its patients' and employees' information and adequately notify them about the incident, Defendant violated state law and harmed an unknown number of its patients and employees.

14.     Plaintiff and the Class are victims of Defendant's negligence and inadequate cybersecurity measures. Specifically, Plaintiff and members of the proposed Class trusted Defendant with their PII/PHI. But Defendant betrayed that trust when Defendant made records containing its employees' and patients' PII/PHI publicly available.

15.     Plaintiff is a former patient of Defendant. Plaintiff secured an Ohio Marijuana Card from Defendant for medical, and not recreational, purposes. In order to obtain medical services

from Defendant, Plaintiff was required to provide his PII/PHI to Defendant, including at least his name, date of birth, address, phone number, email address, and financial account information, as well as the fact that he sought Defendant's services for medical purposes.

16.     The public exposure of one's PII/PHI is a bell that cannot be unrung. Before the Cybersecurity Incident the private health information and identifying information of Plaintiff and the Class was exactly that—private. Not anymore. Now, their private information is permanently exposed and unsecure.

## PARTIES

17.     Plaintiff John Doe is a natural person and citizen of Westerville, Ohio.

18.     Defendant Ohio Medical Alliance LLC, d/b/a Ohio Marijuana Card, is a limited liability company incorporated in Ohio, with its headquarters at 4500 Rockside Road, Independence, OH 44131. It has marijuana doctor office locations located in every major city in Ohio, as well as clinics in Arkansas, Kentucky, Louisiana, Virginia, and West Virginia.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs; Plaintiff and Defendant are citizens of different states; and there are over 100 putative Class members.

20.     This Court has personal jurisdiction over Defendant because it is headquartered in Ohio, regularly conducts business in Ohio, and has sufficient minimum contacts with Ohio.

21.     Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND

### *Defendant Collected and Stored the PII/PHI of Plaintiff and the Class*

22.     Ohio Medical Alliance LLC (OMA) operates under the brand "Ohio Marijuana Card." This company is a telemedicine and in-person provider that helps clients obtain physician-certified medical marijuana cards. OMA facilitates evaluations for a wide range of qualifying health conditions through state-licensed doctors.

23.     Headquartered in Independence, Ohio (a suburb of Cleveland), OMA has marijuana doctor office locations located in every major city in Ohio, as well as clinics in Arkansas, Kentucky, Louisiana, Virginia, and West Virginia.[2] As such, it has serviced over 340,000 patients nationwide.

24.     On information and belief, OMA accumulates highly private PII/PHI of its patients and employees, including information protected by HIPAA.

25.     In collecting and maintaining its patients' and employees' PII/PHI, OMA agreed it would safeguard the data in accordance with state law and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their PII/PHI.

26.     OMA understood the need to protect its current and former patients and employees' PII/PHI and prioritize its data security. Indeed, in its Privacy Policy, OMA falsely states, "Ohio Medical Alliance uses reasonable and appropriate security measures to safeguard the information that has been collected from you via the public or Secure Website Services. Among the measures that Ohio Medical Alliance has implemented for its websites are administrative, physical and technical safeguards."[3]

---

[2] OMA,  https://www.ohiomarijuanacard.com/ (last visited Aug. 24, 2025).

[3] OMA,  *Privacy Policy,* https://www.ohiomarijuanacard.com/ (last visited Aug. 24, 2025).

27.     OMA also claims, "When you visit Ohio Medical Alliance's public websites, no personal information—such as your name, date of birth or telephone number —is collected, unless you provide us with that information voluntarily. Ohio Medical Alliance will not sell, license, transmit or disclose this information outside of Ohio Medical Alliance and its affiliated companies unless (a) expressly authorized by you, (b) necessary to enable Ohio Medical Alliance's contractors or agents to perform certain functions for us, or (c) required or permitted by law. In all cases, we will disclose the information consistent with applicable laws and regulations and we will require the recipient to protect the information and use it only for the purpose it was provided."[4]

28.     Despite recognizing its duty to do so, on information and belief, OMA has not implemented reasonable cybersecurity safeguards or policies to protect the PII/PHI of its patients and employees, or trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, OMA publicly exposes hundreds of thousands of records containing highly private PII/PHI, allowing cybercriminals to exploit and gain access to its patients and employees' PII/PHI.

### *Defendant Failed to Safeguard the PII/PHI of Plaintiff and the Class*

29.     Plaintiff is a former patient of Defendant. Plaintiff secured an Ohio Marijuana Card from Defendant for medical, and not recreational, purposes.

30.     As a condition of receiving medical services from Defendant, Plaintiff was required to provide his PII/PHI to Defendant, including at least his name, date of birth, address, phone number, email address, and financial account information, as well as the fact that he sought Defendant's services for medical purposes.

31.     On information and belief, Defendant collects and maintains its patients and

---

[4] *Id.*

employees' unencrypted PII/PHI in its computer systems.

32.     In collecting and maintaining PII/PHI, Defendant implicitly and explicitly agreed that it will safeguard the data using reasonable means according to state and federal law.

33.     For an unknown period of time prior to August 19, 2025, OMA exposed 957,434 records, with a total size of 323 GB, containing extremely sensitive information, including Social Security Numbers, driver's licenses or identification documents that contained names, physical addresses, DOB, and license numbers and protected health information (collectively, "PII/PHI"). For context, 1 gigabyte is equivalent 1,000 megabytes, and the entire written works of Shakespeare could fit inside just 5 megabytes.[5]

34.     The screenshots below contain a sample of just some of the records belonging to OMA patients and employees, made publicly available to anyone with internet access. The PII/PHI of each victim is redacted for their privacy.[6]

35.     The screenshot immediately below shows an example of some of the identification documents in the exposed database. As seen below, the high-resolution images contain driver's licenses and state identification cards from Virginia, West Virginia, Maryland, Louisiana, Arkansas, Missouri, and Ohio. Also included is an offender release card and a debit card:

---

[5] Paulette Kehely, *How Many documents in A Gigabyte*, Digital WarRoom (Apr. 2, 2020), https://www.digitalwarroom.com/blog/how-many-pages-in-a-gigabyte (last visited Aug. 24, 2025).

[6] Jeremiah Fowler, *Nearly a Million Records, Including Identification Documents and Health Data Exposed in Medical Marijuana Data Breach*, Website Planet (Aug. 19, 2025), https://www.websiteplanet.com/news/ohio-medical-alliance-breach-report/ (last visited Aug. 24, 2025).



36.    The screenshot immediately below shows a patient health summary that includes PII and PHI, including addresses, place of birth, health problems, medications, and more:



37.     The two screenshots immediately below show segments of medical record documentation containing diagnosed health conditions, including the diagnoses of HIV and epilepsy for one patient, and a PTSD diagnosis for a 16-year-old female:

5. Name of Person We Can Speak With

Name:

Phone Number

## Ohio Qualifying Condition(s)

Ohio's Medical Marijuana Control Program has designated 25 medical conditions that make an individual eligible for treatment with medical marijuana.

6. Please select your qualifying condition(s) for which you seek treatment with medical marijuana:

☐ AIDS
☐ Alzheimer's Disease
☐ Cancer
☐ Crohn's Disease
☐ Fibromyalgia
☐ Hepatitis C
☐ IBD - Inflammatory Bowel Disease
☐ Pain that is either chronic and severe or intractable
☑ Positive status for HIV
☐ Sickle Cell Anemia
☐ Spinal cord disease or injury
☐ Tourette's Syndrome
☐ Ulcerative Colitis

☐ ALS - Amyotrophic Lateral Sclerosis
☐ Cachexia
☐ CTE - Chronic Traumatic Encephalopathy
☑ Epilepsy or another seizure disorder
☐ Glaucoma
☐ Huntington's Disease
☐ MS - Multiple Sclerosis
☐ Parkinson's Disease
☐ PTSD - Post-traumatic Stress Disorder
☐ Spasticity
☐ Terminal Illness
☐ Traumatic brain injury

## Medical Record Documentation of Qualifying Condition

The state of Ohio requires physicians to certify patients for medical marijuana based on the verification of a qualifying condition. Although medical records are not required at the time of your appointment, it helps the physician determine if medical marijuana is right for you. It also ensures you will be approved on the day of your appointment and prevent any delays in receiving your recommendation.

## Patient Assessment & Physical Examination

1. Basic Demographics

| First Name | Middle Initial/Name | Last Name | Date of Birth |
|---|---|---|---|
| | | | (age 16) |

2. Evaluation Summary

| Physician | Type of Visit | Date of Evaluation | Appointment Location |
|---|---|---|---|
| , MD | New Patient | 11/01/2022 | Telemed |

3. Additional Demographics

Gender
☑ Female ☐ Male ☐ Prefer to self-describe
☐ Prefer not to say ☐ Other

4. Past Medical and Surgical History, Diagnostic Studies (when applicable), Family History, Social History and Review of Systems

I have reviewed this information in the patient's Intake Questionnaire
☑ Yes ☐ No

5. Pregnancy Risk Assessment

⊘ Not at risk (age, surgery, other)        ○ Not at risk - protection measures in place        ○ Contemplating pregnancy in the near future
○ Currently pregnant        ○ Currently breast feeding

6. Medications & Allergies

Medications & Allergies
☑ Reviewed ☐ Not reviewed
☐ n/a ☐ None

## History of Qualifying Condition

7. HPI: History of Qualifying Condition(s) and Previous Response to Treatment

Patient is a is 16 year old female with history of PTSD and I have reviewed the risk and benefits of medical cannabis in a teenager with the patients mom                    the patient and Mom have verbalize consent to understanding all adverse effects of medical cannabis in teenagers and feels comfortable to still utilize medical cannabis for the PTSD symptoms.

38.     The screenshot immediately below shows a sample of a document labeled "Staff Comments" containing client interactions, including private health information (such as HIV diagnoses), names, email addresses, and more:



39.     Again, all of this information was publicly available, posted online, unencrypted and without password protection, to anyone with internet access.

40.     It is unclear when OMA first exposed these records, how long the Cybersecurity Incident lasted, and when Defendant discovered the Cybersecurity Incident.

41.     The fact over 323 GB of data was publicly exposed by OMA demonstrates Defendant's cyber and data security systems were completely inadequate. As such, OMA allowed anyone with access to the internet to obtain files containing a treasure trove of hundreds of thousands of its patients and employees' highly private information.

42.     Defendant knew, or should have known, of the risks of posting its patients' and employees' PII/PHI online, as well as failing to encrypt or password protect it.

43.     In light of the information readily available and accessible before and during the Cybersecurity Incident, Defendant, knew or should have known that there was a foreseeable risk

that Plaintiff's and Class Members' PII/PHI could be accessed and exfiltrated, as a result of its public posting online.

44.     Despite the fact its patients and employees' PII/PHI was publicly available online for an unknown amount of time, Defendant has not yet notified victims of the Cybersecurity Incident of the Cybersecurity Incident.

45.     Thus, Defendant continues to keep the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner. In so doing, Defendant has deprived and continues to deprive Plaintiff and the Class of the earliest opportunity to take appropriate measures to protect their PII/PHI and take other necessary steps to mitigate the harm caused by the Cybersecurity Incident.

46.     Despite its duties to safeguard PII/PHI, Defendant did not follow industry standard practices in securing patients and employees' PII/PHI, as evidenced by the Cybersecurity Incident.

47.     Defendant's failure to adopt adequate cybersecurity measures demonstrates that there is a substantial risk of another cybersecurity incident, or that another cybersecurity incident is certainly impending.

48.     Moreover, Defendant has not reported the Cybersecurity Incident to California regulators or the HHS, despite its obligations to do so. If a breach of unsecured protected health information affects 500 or more individuals, the company must notify the Secretary of the breach "in no case later than 60 calendar days from the discovery of the breach."[7]

49.     Even with the purchase of credit monitoring services, the risk of identity theft and unauthorized use of Plaintiff's and Class Members' PII/PHI is still substantially high. The

---

[7] HHS, *Submitting a Notice of a Breach to the Secretary,* https://www.hhs.gov/hipaa/for-professionals/breach-notification/breach-reporting/index.html (last visited Aug. 24, 2025).

fraudulent activity resulting from the Cybersecurity Incident may not come to light for years.

50. Cybercriminals need not harvest a person's Social Security Number or financial account information in order to commit identity fraud or misuse Plaintiff's and the Class's PII/PHI (although here, SSNs and financial account information were compromised). Cybercriminals can cross-reference the data made publicly available during the Cybersecurity Incident and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiff and the Class's financial accounts.

51. On information and belief, Defendant failed to adequately train its IT and data security employees on reasonable cybersecurity protocols or implement reasonable security measures, resulting in public access to hundreds of thousands of records containing its patients and employees' PII/PHI. Defendant's negligence is evidenced by its failure to prevent the Cybersecurity Incident, and to stop the public, writ large (including cybercriminals) from accessing the PII/PHI it stored in its databases.

52. Furthermore, Defendant has intentionally failed to inform Plaintiff and Class Members of the Cybersecurity Incident.

***Plaintiff's Experience and Injuries***

53. Plaintiff is former patient of Defendant, and, on information and belief, a victim of the Cybersecurity Incident.

54. As a condition of receiving medical services, Defendant required Plaintiff to provide his PII/PHI, including at least his name, date of birth, address, phone number, email address, and financial account information, as well as the fact that he sought Defendant's services for medical purposes.

55.    Plaintiff provided his PII/PHI to Defendant and trusted that the company would use reasonable measures to protect it according to state and federal law.

56.    Had Plaintiff known that Defendant's databases were publicly available online, he would not have agreed to provide his PII/PHI to it.

57.    Plaintiff is very careful about sharing his sensitive PII/PHI. Plaintiff stores any documents containing his PII in a safe and secure location. he  has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendant had he  known of Defendant's lax data security policies.

58.    As a result of its inadequate cybersecurity measures and data destruction policies, Defendant exposed Plaintiff's PII/PHI for theft by cybercriminals and/or anyone with internet access.

59.    Indeed, given the volume of records made publicly available by OMA, Plaintiff's PII/PHI has already been published online.

60.    Defendant deprived Plaintiff of the earliest opportunity to guard himself against the Cybersecurity Incident's effects by failing to promptly notify him about the Cybersecurity Incident.

61.    Plaintiff suffered actual injury from the exposure of his PII/PHI —which violates his rights to privacy.

62.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendant was required to adequately protect.

63.    Plaintiff has spent time and made reasonable efforts to mitigate the impact of the Cybersecurity Incident, including but not limited to researching the Cybersecurity Incident,

reviewing credit card and financial account statements, changing his online account passwords, and monitoring his credit information.

64.     Plaintiff has already spent a significant amount of time dealing with the Cybersecurity Incident and will continue to spend valuable time he would have otherwise spent on other activities, including but not limited to, work and/or recreation. Plaintiff's efforts were reasonable and necessary given the volume of data OMA made publicly available online.

65.     Plaintiff fears for his personal financial security and uncertainty over what PII/PHI was exposed. Plaintiff has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Cybersecurity Incident. Plaintiff is experiencing anxiety, distress, and fear regarding how the exposure and loss of his Social Security Number and other categories of private data will impact him. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Cybersecurity Incident victim that the law contemplates and addresses. These emotional injuries were caused by Plaintiff's exposure to a heightened risk— of identity theft and fraud—which has been substantially elevated because of the volume of PII/PHI made publicly available by OMA, indicating Plaintiff's information remains unprotected while in OMA's possession.

66.     Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII/PHI being placed in the hands of unauthorized third parties. Indeed, anyone with internet access was able to access these records for an unknown period of time. This injury is worsened by Defendant's  failure to promptly inform Plaintiff about the Cybersecurity Incident.

67.     As a result of Defendant's inadequate cybersecurity measures and data destruction policies, Plaintiff has experienced a substantial increase in scam and spam text messages and

emails relating to marijuana use, all suggesting his PII is now in the hands of cybercriminals. For example, on August 25, 2025, Plaintiff received approximately 30 spam emails relating to marijuana.

68.     Once an individual's PII/PHI is for access on online, cybercriminals are able to use the information to gather and steal even more information.[8] Defendant required Plaintiff to provide his PII/PHI, including at least his name, date of birth, address, phone number, email address, and financial account information, as well as the fact that he sought Defendant's services for medical purposes.

69.     Plaintiff has a continuing interest in ensuring that his PII/PHI, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future cybersecurity incidents. Given OMA's grossly inadequate security measures, there is a substantial risk of another cybersecurity incident of OMA's systems, or that incident is certainly impending.

### _Plaintiff and the Class Suffered Common Injuries and Damages Due to Defendant's Conduct_

70.     Plaintiff and members of the proposed Class have suffered injury from the misuse of their PII/PHI that can be directly traced to Defendant.

71.     As a result of Defendant's failure to prevent the Cybersecurity Incident, Plaintiff and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiff and the class have suffered or are at an increased risk of suffering:

    a.   Identity theft and fraud;

---

[8] Ryan Toohill, *What do Hackers do with Stolen Information,* Aura (Sept. 5, 2023), https://www. aura.com/learn/what-do-hackers-do-with-stolen-information (last visited Aug. 24, 2025).

b.   The loss of the opportunity to control how their PII/PHI is used;

c.   The diminution in value of their PII/PHI;

d.   The compromise and continuing publication of their PII/PHI;

e.   Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

f.   Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Cybersecurity Incident, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

g.   Delay in receipt of tax refund monies;

h.   Unauthorized use of PII/PHI made publicly available by OMA during the Cybersecurity Incident; and

i.   The continued risk to their PII/PHI, which remains in the possession of Defendant and is subject to further unauthorized disclosure so long as Defendant fails to undertake the appropriate measures to protect the PII/PHI in its possession.

***Significant Risk of Continued Identity Theft***

72.   Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Cybersecurity Incident.

73.   The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

74. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

75. The link between a Cybersecurity Incident and the risk of identity theft is simple and well established. Criminals acquire individuals' personal data to monetize the information. Sometimes criminals acquire PII/PHI by theft, as in a data breach, and sometimes criminals acquire PII/PHI due to wrongful disclosure or publication, as here. Criminals then monetize the data by selling the information on the internet black market (aka the dark web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

76. The dark web is an unindexed layer of the internet that requires special software or authentication to access.[9] Criminals in particular favour the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[10] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know. However here, the data was not simply made available on the dark web, but made available online in general, and therefore it was accessible to anyone with internet access.

---

[9] Louis DeNicola, *What Is the Dark Web?*, Experian (May 12, 2021), https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited Aug. 24, 2025).

[10] *Id.*

77.     The unencrypted PII/PHI of Plaintiff and Class Members has already been available on the internet for an unknown period of time, and will likely end up for sale on the dark web given the opportunistic nature of cybercrime. In addition, unencrypted and detailed PII/PHI may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access and have already easily accessed the Plaintiff's and Class Members' PII/PHI.

78.     Unauthorized disclosure of Social Security Numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

79.     Due to the highly sensitive nature of Social Security Numbers, theft of Social Security Numbers in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you haven't gotten a credit freeze yet, you're easy pickings."[11]

80.     There may also be a time lag between when sensitive personal information is disclosed, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Cybersecurity Incident may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer

---

[11] Patrick Lucas Austin, *'It Is Absurd.' Cybersecurity Incidents Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, Time (Aug. 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/ (last visited Aug. 24, 2024).

of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

81.     For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[12]

82.     It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII is forever in cyberspace and was viewed and/or taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

83.     Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

84.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security Number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

85.     Identity thieves can also use an individual's personal data and PII/PHI to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use

---

[12] John W. Coffey, *Difficulties in Determining Cybersecurity Incident Impacts*, 17 Journal of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf (last visited Aug. 24, 2024).

the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[13]

86.     One example of criminals piecing together bits and pieces of compromised PII/PHI to create comprehensive dossiers on individuals is called "Fullz" packages.[14] These dossiers are both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of PII/PHI to marry unregulated data available elsewhere to the data OMA made publicly online, for anyone to view and download.  an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the PII/PHI made publicly available by OMA, and with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

---

[13] Hari Ravichandran, *What Can Someone Do with Your Social Security Number?,* Aura (Apr. 8, 2024), https://www.aura.com/learn/what-can-someone-do-with-your-social-security-number (last visited Aug. 24, 2025).

[14] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* Krebs on Security (Sept. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited Aug. 24, 2025).

87.     The development of "Fullz" packages means that the PII/PHI exposed in the Cybersecurity Incident can easily be linked to data of Plaintiff and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers was not included in the PII/PHI disclosed online by OMA in the Cybersecurity Incident, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class members' PII/PHI is being misused, and that such misuse is fairly traceable to the Cybersecurity Incident.

88.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[15]

89.     Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[16] Yet, Defendant failed to rapidly report to Plaintiff and the Class that their PII/PHI was available in the public domain, online, for anyone to view and download.  Defendant's failure to promptly and properly notify Plaintiff and Class members of the Cybersecurity Incident exacerbated Plaintiff and Class members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII/PHI and take other necessary steps to mitigate the harm caused by the Cybersecurity Incident.

---

[15] FBI, *2019 Internet Crime Report*, FBI.gov (Feb. 11, 2020), https://www.fbi.gov/news/stories/ 2019-internet-crime-report-released-021120 (last visited Aug. 24, 2025).

[16] *Id.*

90.     Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

91.     In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII/PHI. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

92.     Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the PII/PHI procured in this Cybersecurity Incident. To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

### *Loss of Time to Mitigate the Risk of Identify Theft and Fraud*

93.     As a result of the recognized risk of identity theft, when a Cybersecurity Incident occurs, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the incident, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

94.     In the event that Plaintiff and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record.

95. Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their financial accounts for many years to mitigate that harm.

96. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

97. These efforts are consistent with the steps that FTC recommends that Cybersecurity Incident victims take several steps to protect their personal and financial information after a Cybersecurity Incident, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[17]

98. Once PII/PHI is exposed, as here, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct that caused led to the unauthorized public disclosure of hundreds of thousands of records containing PII/PHI, in this Cybersecurity Incident.

---

[17] *See* FTC, *What To Do Right Away: What To Do Next*, IdentityTheft.gov, https://www.identitytheft.gov/Steps (last visited Aug. 24, 2025).

*Diminished Value of PII/PHI*

99.     Personal data like PII/PHI is a valuable property right.[18]  Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII/PHI has considerable market value.

100.     An active and robust legitimate marketplace for personal information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[19]

101.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.

102.     For example, PII can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[20] Experian reports that a stolen credit or debit card number can sell for $10 to $240 on the dark web.[21] All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to

---

[18] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII/PHI") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII/PHI, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[19] David Lazarus, *Shadowy data brokers make the most of their invisibility cloak*, Los Angeles Times (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Aug. 24, 2025).

[20] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/. (last visited Aug. 24, 2025).

[21] Ben Luthi, *Here's What Your Data Sells for on the Dark Web*, Experian (June 30, 2025), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Aug. 24, 2025).

$1,300 each on the black market.[22] Criminals can also purchase access to entire company data from $900 to $4,500.[23] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[24]

103.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[25] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60 a year.[26]

104.    As a result of the Cybersecurity Incident, Plaintiff's and Class Members' PII/PHI, which has an inherent market value in both legitimate and black markets, has been damaged and diminished in its value by its unauthorized release online by OMA, and likely release onto the dark web even though the database is no longer generally available to the public, where holds significant value for the threat actors.

105.    However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII/PHI is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

---

[22] Adam Greenberg, *Health insurance credentials fetch high prices in the online black market*, SC World (July 16, 2013), https://www.scworld.com/news/health-insurance-credentials-fetch-high-prices-in-the-online-black-market (last visited Aug. 24, 2025).

[23] VPNOverview, *In the Dark*, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Aug. 24, 2025).

[24] *See* FBI Cyber Division, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (Apr. 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf (last visited Aug. 24, 2025).

[25] Datacoup, Inc., *The Personal Data Revolution* (2020), https://datacoup.com/ (last visited Aug. 24, 2025).

[26] Nielsen Computer & Mobile Panel, *Frequently Asked Questions*, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Aug. 24, 2025).

***Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary***

106.     To date, Defendant has done nothing to provide Plaintiff and Class Members with relief for the damages they have suffered due to the Cybersecurity Incident.

107.     Given the fact that hundreds of thousands of records containing sensitive PII/PHI have been available in the public domain, online, for an unknown amount of time, there is a strong probability that the data has already been misused. Indeed, opportunistic cybercriminals have likely placed entire batches of PII/PHI on the dark web for sale and purchase by criminals intending to utilize the PII/PHI for identity theft crimes— e.g., opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or insurance; or filing false unemployment claims.

108.     Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or his information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

109.     Furthermore, the information accessed and disseminated in the Cybersecurity Incident is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel their cards and request a replacement.[27] Here, in addition to high resolution images of debit and/or credit cards, SSNs and health information was also publicly exposed.

---

[27] Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds,* Forbes (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/ (last visited Aug. 24, 2025).

110.     The information disclosed in this Cybersecurity Incident is impossible to "close" and difficult, if not impossible, to change (such as Social Security Numbers).

111.     Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

112.     The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Cybersecurity Incident. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their PII/PHI.

### *Lost Benefit of the Bargain*

113.     Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain.

114.     When agreeing to provide their PII/PHI, Plaintiff and Class Members, as employees and patients, understood and expected that they were, in part, paying for services and data security to protect the PII/PHI they were required to provide.

115.     Plaintiff values data security. Indeed, data security is an important consideration when seeking employment and medical services.

116.     In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[28] Therein, Cisco reported the following:

      a.     "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative

---

[28] Cisco, *Privacy Awareness: Consumers Taking Charge to Protect Personal*, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited Aug. 24, 2025).

obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[29]

b.  "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[30]

c.  89% of consumers stated that "I care about data privacy."[31]

d.  83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[32]

e.  51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[33]

f.  75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[34]

### **_Defendant Could Have Prevented the Cybersecurity Incident_**

117.  Cybersecurity Incidents are preventable.[35] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate

---

[29] _Id_. at 3.

[30] _Id_.

[31] _Id_. at 9.

[32] _Id_.

[33] _Id_.

[34] _Id_. at 11.

[35] Lucy L. Thomson, "Despite the Alarming Trends, Cybersecurity Incidentes Are Preventable," _in Cybersecurity Incident and Encryption Handbook_ (Lucy Thompson, ed., 2012).

security solutions."[36] he    added that "[o]rganizations that collect, use, store, and share sensitive

personal data must accept responsibility for protecting the information and ensuring that it is not

compromised . . . ."[37] Indeed, organizations like OMA must not only protect the data entrusted

from cybercriminals, but from the public writ large.

118.    "Most of the reported data breaches are a result of lax security and the failure to

create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information

security controls, including encryption, must be implemented and enforced in a rigorous and

disciplined manner so that a Cybersecurity Incident never occurs." [38]

119.    In a Cybersecurity Incident like the one here, many failures laid the groundwork

for the Incident. Indeed, cybercriminals did not even need to target and hack OMA's databases,

because OMA itself published its patients' records online for anyone with internet access to view.

120.    For example, the FTC has published guidelines that establish reasonable data

security practices for businesses. The guidelines also emphasize the importance of having a data

security plan, regularly assessing risks to computer systems, and implementing safeguards to

control such risks.

121.    Additionally, several industry-standard best practices have been identified that—at

a minimum—should be implemented by businesses like Defendant.

### Defendant Failed to Adhere to FTC Guidelines

122.    According to the Federal Trade Commission ("FTC"), the need for data security

should be factored into all business decision-making.  To that end, the FTC has issued numerous

---

[36] *Id.* at 17.

[37] *Id.* at 28.

[38] *Id.*

guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of PII/PHI.

123.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business.  The guidelines explain that businesses should:

      a.     protect the personal consumer information that they keep;

      b.     properly dispose of personal information that is no longer needed;

      c.     encrypt information stored on computer networks;

      d.     understand their network's vulnerabilities; and

      e.     implement policies to correct security problems.

124.    The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

125.    The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

126.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

127.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to employees' and patients' PII/PHI constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

### Defendant Failed to Follow Industry Standards

128.    Several best practices have been identified that—at a minimum—should be implemented by businesses like Defendant. These industry standards include: educating all employees regarding cybersecurity; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

129.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

130.    Moreover, companies should retain personal data only as necessary, with legal justification. Personal data should not be stored beyond the time necessary to achieve its initial purpose of collection. In line with industry standard practices, Defendant should have promptly deleted the data belonging to former employees and patients.

131.    Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04)

and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

132.    These frameworks are applicable and accepted industry standards. Yet Defendant ignored these standards and made hundreds of thousands of patient records available online, for anyone with internet to view and download.

### *Defendant Violated HIPAA*

133.    HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII and PHI is properly maintained.[39]

134.    The Cybersecurity Incident itself resulted from a combination of inadequacies showing Defendant failed to comply with safeguards mandated by HIPAA. Defendant's security failures include, but are not limited to:

- failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

- failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

- failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

- failing to ensure compliance with HIPAA security standards by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

---

[39] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

- failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

- failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

- failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

- failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

- failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

*135.* Simply put, the Cybersecurity Incident resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations.

## CLASS ACTION ALLEGATIONS

136. Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

All individuals residing in the United States whose PII/PHI was compromised in the Cybersecurity Incident of Ohio Medical Alliance LLC's network.

137. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including its staff and immediate family.

138. Plaintiff reserves the right to amend the class definition.

139. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

140. This action satisfies the numerosity, commonality, typicality, and adequacy requirements.

141. **Numerosity.** The Class members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes thousands of members.

142. **Commonality and Predominance.** Plaintiff's and the Class Members' claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

 a. if Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII/PHI;

 b. if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Cybersecurity Incident;

     c.     if Defendant was negligent in maintaining, protecting, and securing PII/PHI;

     d.     if Defendant breached contract promises to safeguard Plaintiff and the Class's PII/PHI;

     e.     if Defendant took reasonable measures to determine the extent of the Cybersecurity Incident after discovering it;

     f.     if Defendant's Breach Notice was reasonable;

     g.     if the Cybersecurity Incident caused Plaintiff and the Class injuries;

     h.     what the proper damages measure is; and

     i.     if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

143.    **Typicality.** Plaintiff's claims are typical of Class Members' claims as each arises from the same Cybersecurity Incident, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Cybersecurity Incident.

144.    **Adequacy.** Plaintiff will fairly and adequately protect the proposed Class's common interests. His interests do not conflict with Class Members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

145.    **Appropriateness.** The likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case. Plaintiff is not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

146.  **Ascertainability.**  All members of the proposed Class are readily ascertainable from information in Defendant's custody and control.

## FIRST CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiff and the Class)

147.  Plaintiff incorporates all previous paragraphs as if fully set forth herein.

148.  Plaintiff and the Class entrusted their PII/PHI to Defendant on the premise and with the understanding that Defendant would safeguard their PII/PHI, use their PII/PHI for medical or purposes only, and/or not disclose their PII/PHI to unauthorized third parties.

149.  Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII/PHI. And here, Defendant compromised its patients' and employees' PII/PHI by making it publicly available on the web for anyone to view and download.

150.  Defendant's duty of care is an independent, non-contractual duty of care arising from the special relationship between Defendant and Plaintiff, and the fact Defendant assume responsibility to collect and store Plaintiff and the Class Member's PII/PHI.

151.  Defendant has full knowledge of the sensitivity of the PII/PHI and the types of harm that Plaintiff and the Class could and would suffer if their PII/PHI was wrongfully disclosed.

152.  Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiff's and Class Members' PII/PHI.

153.  Defendant owed to Plaintiff and Class Members at least the following duties to:

      a.       avoid posting records containing PII/PHI online;

      b.       exercise reasonable care in handling and using the PII/PHI in its care and custody by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI;

      c.       to adequately monitor the security of its networks and systems;

      d.       to prevent unauthorized access to Plaintiff and Class members PII/PHI; and

      e.       to detect, in a timely manner, that Plaintiff's and Class members' PII/PHI had been compromised.

154.    Plaintiff and Class members about the Cybersecurity Incident's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; Also, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Cybersecurity Incident. After all, this duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their PII/PHI, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Cybersecurity Incident.

155.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII/PHI it was no longer required to retain under applicable regulations.

156.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII/PHI of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class. Indeed, the harm did not even occur through

the criminal acts of a third party but through OMA's own grossly negligence conduct in posting records containing its patients' and employees' PII/PHI online.

157. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PII/PHI, a necessary part of obtaining medical services or employment from Defendant.

158. The risk that unauthorized persons would attempt to gain access to the PII/PHI, in the event it remained unencrypted, without password protection, or publicly available online, and then misuse it was foreseeable.

159. PII/PHI is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII/PHI of Plaintiff's and Class Members' and the importance of exercising reasonable care in handling it.

160. Defendant improperly and inadequately safeguarded the PII/PHI of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Cybersecurity Incident. Indeed, Defendant allowed hundreds of thousands of records containing PII/PHI to be available online, unencrypted and without password protection.

161. Defendant breached these duties as evidenced by the Cybersecurity Incident.

162. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff 'and Class Members' PII/PHI by:

      a. disclosing and providing access to this information to third parties; and

      b. failing to properly supervise both the way the PII/PHI was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

163.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the PII/PHI of Plaintiff and Class Members which actually and proximately caused the Cybersecurity Incident and Plaintiff's and Class Members' injury.

164.    Defendant further breached its duties by failing to provide reasonably any notice of the Cybersecurity Incident to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Cybersecurity Incident and Plaintiff's and Class Members' injuries-in-fact.

165.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

166.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the publication of their PII/PHI online for anyone with internet access to view and download, improper disclosure of their PII/PHI, lost value of their PII/PHI, and lost time and money incurred to mitigate and remediate the effects of the Cybersecurity Incident that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
### Negligence *per se*
### (On Behalf of Plaintiff and the Class)

167.    Plaintiff incorporates all previous paragraphs as if fully set forth herein.

168.    Defendant had a duty to employ reasonable security measures under Section 5 of

the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data. Plaintiff and Class members are within the class of persons that Section 5 of the FTCA was intended to protect. The harm occurring as a result of the Cybersecurity Incident is the type of harm that Section 5 of the FTCA intended to guard against. Defendant violated Section 5 of the FTCA by failing to adequately safeguard Plaintiff's and Class members' PII.

169.    Defendant breached its respective duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII/PHI, and by publishing Plaintiff's and the Class Members' PII/PHI online for anyone with internet access to view and download

170.    Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII/PHI and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII/PHI Defendant had collected and stored and the foreseeable consequences of a public disclosure of PII/PHI, including, specifically, the immense damages that would result to individuals in the event of public disclosure, which ultimately came to pass.

171.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

172.    Defendant's duty to use reasonable security measures also arose under the HIPPA, under which they were required to protect the security, confidentiality, and integrity of consumer

health information. The harm occurring as a result of the Cybersecurity Incident is the type of harm that the HIPPA intended to guard against. Defendant violated the HIPPA by failing to adequately safeguard Plaintiff's and Class members' PII.

173.    But for Defendant's wrongful and negligent breach of its duties owed, Plaintiff and Class Members would not have been injured.

174.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their PII/PHI.

175.    Defendant's violations and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

176.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

### THIRD CAUSE OF ACTION
### Breach of Express and Implied Contract
### (On Behalf of Plaintiff and the Class)

177.    Plaintiff incorporates all previous paragraphs as if fully set forth herein.

178.    Defendant offered to provide employment and/or medical services to Plaintiff and members of the Class if, and in exchange, Plaintiff and members of the Class provided Defendant with their PII/PHI.

179.    In providing their PII, Plaintiff and Class members entered into either an express or implied contract with Defendant, whereby Defendant, in receiving such data, became obligated to reasonably safeguard Plaintiff's and the other Class members' PII.

180.     Plaintiff and the members of the Class accepted Defendant's offer by providing PII/PHI to Defendant in exchange for employment and/or medical services.

181.     Explicit in the Defendant's Privacy Policy and Terms & Conditions of Use, which Plaintiffs and Class Members agreed to by using their website, expressly represents that all patient information is kept confidential in their HIPAA-compliant file storage system. This is false. OMA also promised: "Ohio Medical Alliance will not sell, license, transmit or disclose this information outside of Ohio Medical Alliance and its affiliated companies unless (a) expressly authorized by you, (b) necessary to enable Ohio Medical Alliance's contractors or agents to perform certain functions for us, or (c) required or permitted by law." This too is false.

182.     Implicit in the agreement between Plaintiff and Class members and the Defendant to provide PII, was the latter's obligation to: (a) use such PII for business or medical purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiff and Class members with prompt and sufficient notice of any and all unauthorized access and/or publication of their PII, (e) reasonably safeguard and protect the PII of Plaintiff and Class members from unauthorized disclosure or uses, and (f) retain the PII only under conditions that kept such information secure and confidential.

183.     Plaintiff and the members of the Class would not have entrusted their PII/PHI to Defendant in the absence of such an agreement with Defendant.

184.     Defendant accepted possession of Plaintiff's and Class members' PII.

185.     Had Defendant disclosed to Plaintiff and Class members that hundreds of thousands of its records containing sensitive PII/PHI were available in the public domain, or that Defendant did not have adequate computer systems and security practices to secure consumers' PII, Plaintiff and Class members would not have provided their PII to Defendant.

186.     Defendant recognized that consumers' PII is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and Class members.

187.     Plaintiff and Class members fully performed their obligations under the implied contracts with Defendant.

188.     Defendant materially breached the contracts it had entered with Plaintiff and members of the Class by failing to safeguard such information and failing to notify them promptly of the intrusions into its computer systems that compromised such information. Defendant also breached the implied contracts with Plaintiff and members of the Class by:

      a.     Failing to properly safeguard and protect Plaintiff's and members of the Class's PII/PHI;

      b.     Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and

      c.     Failing to ensure the confidentiality and integrity of electronic PII/PHI that Defendant created, received, maintained, and transmitted.

189.     As a direct and proximate result of the breach of the contractual duties, Plaintiff and Class members have suffered actual, concrete, and imminent injuries. The injuries suffered by Plaintiff and the Class members include: (a) the invasion of privacy; (b) the compromise, disclosure, publication, and unauthorized use of Plaintiff's and Class members' PII; (c) economic costs associated with the time spent to detect and prevent identity theft, including loss of productivity; (d) monetary costs associated with the detection and prevention of identity theft; (e) economic costs, including time and money, related to incidents of actual identity theft; (f) the emotional distress, fear, anxiety, nuisance and annoyance of dealing related to the publication and

compromise of their PII; (g) the diminution in the value of the services bargained for as Plaintiff's and Class members were deprived of the data protection and security that Defendant promised when Plaintiff and the Class members entrusted Defendant with their PII; and (h) the continued and substantial risk to Plaintiff's and Class members' PII, which remains in the Defendant's possession with inadequate measures to protect Plaintiff's and Class members' PII.

190.    Additionally, the covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

191.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

192.    Defendant failed to advise Plaintiff and members of the Class of that there was a Cybersecurity Incidents, and failed to send Notice to the victims promptly and sufficiently. Indeed, OMA has not notified its patients that it made hundreds of thousands of records containing valuable PII/PHI available online for anyone to view or download.

193.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

194.    Plaintiff and members of the Class have sustained damages because of Defendant's breaches of its agreement, including breaches of it through violations of the covenant of good faith and fair dealing.

195.     Plaintiff, on behalf of himself and the Class, seeks compensatory damages for breach of implied contract, which includes the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

### FOURTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

196.     Plaintiff incorporates all previous paragraphs as if fully set forth herein.

197.     This claim is pleaded in the alternative to the breach of implied contract claim.

198.     Upon information and belief, Defendant funds its data security measures from its general revenue, including the money generated from Plaintiff's and the Class Members' employment services, and payments for medical services made by or on behalf of Plaintiff and the Class Members.

199.     As such, a portion of the revenue gleaned from Plaintiff's and the Class Members' employment services, and a portion of the payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

200.     Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they either provided services, in the form of employment, contracted with Defendant, or purchased medical services from Defendant and/or its agents and in so doing provided Defendant or its agents with their PII/PHI. In exchange, Plaintiff and Class Members should have had their PII/PHI protected with adequate data security.

201.     Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII/PHI of Plaintiff and Class Members for business purposes and medical services.

202.     Defendant was enriched by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII/PHI. Instead of providing a reasonable level of security that would have prevented the Cybersecurity Incident, Defendant calculated to avoid the data security obligations at the expense of Plaintiff and the Class by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

203.     Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

204.     Defendant acquired the monetary benefit and PII/PHI through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

205.     If Plaintiff and Class Members knew that Defendant had not secured their PII/PHI, they would not have agreed to provide their PII/PHI to Defendant.

206.     Plaintiff and Class Members have no adequate remedy at law.

207.     As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) the loss of the opportunity how their PII/PHI is used; (ii) the compromise, publication, and/or publication of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Cybersecurity Incident, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk

to their PII/PHI, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII/PHI in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII/PHI compromised as a result of the Cybersecurity Incident for the remainder of the lives of Plaintiff and the Class.

208.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them.

**FIFTH CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiff and the Class)**

209.    Plaintiff incorporates all previous paragraphs as if fully set forth herein.

210.    Plaintiff and Class Members had a legitimate expectation of privacy regarding their PII/PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

211.    Defendant owed a duty to Plaintiff and Class Member to keep their PII/PHI confidential.

212.    The State of Ohio recognizes four distinct types of invasion of privacy, consistent with the general framework established in Restatement (Second) of Torts § 652A: intrusion upon seclusion, public disclosure of private facts, false light, appropriate of name or likeness.

213.    The unauthorized disclosure and/or acquisition (i.e., publication online) to a third party of Plaintiff's and Class Members' PII/PHI is highly offensive to a reasonable person. It constitutes an invasion of privacy both by disclosure of nonpublic facts, and intrusion upon seclusion.

214.    The publication of the PII/PHI on the online, for anyone with internet access to

view and download, is highly offensive to a reasonable person.

215.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class members disclosed their sensitive and confidential information to Defendant as part of seeking Defendant's medical services, or in the process of obtaining employment, but they did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

216.    The Cybersecurity Incident constitutes an intentional interference with Plaintiff's and the Class members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

217.    Defendant acted with a knowing state of mind when it permitted the Cybersecurity Incident because it knew its information security practices were inadequate.

218.    Defendant acted with a knowing state of mind when it failed to notify Plaintiff's and the Class members about the Cybersecurity Incident, thereby materially impairing their mitigation efforts.

219.    Defendant had notice and knew or should have known that publishing patient data online and its inadequate cybersecurity practices would cause injury to Plaintiff's and the Class members.

220.    Because Defendant failed to properly safeguard Plaintiff's and Class Members' PII/PHI, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

221.    As a proximate result of Defendant's acts and omissions, the PII/PHI of Plaintiff and the Class Members was published online and was available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages.

222.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII/PHI is still maintained by Defendant with their inadequate cybersecurity system and policies.

223.    Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their PII/PHI. A judgment for monetary damages will not end Defendant's inability to safeguard the PII/PHI of Plaintiff and the Class.

224.    Plaintiff and Class Members, seek injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiff's and Class Members' PII/PHI.

225.    Plaintiff and Class Members seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

## SIXTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (On Behalf of Plaintiff and the Class)

226.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

227.    In Ohio and in most U.S. jurisdiction, the relationship between a medical provider, such as Defendant, and a patient, such as Plaintiff, is considered a fiduciary relationship under the law. Indeed physicians and medical facilities owe patients a duty of confidentiality arising from the fiduciary nature of the relationship.

228.    Given the relationship between Defendant and Plaintiff and the Class Members, where Defendant became guardian of Plaintiff's and Class Members' PII/PHI, Defendant became a fiduciary by its undertaking and guardianship of the PII/PHI, to act primarily

for Plaintiff and Class members, (1) for the safeguarding of Plaintiff and Class members' PII/PHI; (2) to timely notify Plaintiff and Class Members of the Cybersecurity Incident and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

229.    Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of Defendant's relationship with them—especially to secure their PII/PHI.

230.    Because of the highly sensitive nature of the PII/PHI, Plaintiff and Class members (or their third-party agents) would not have entrusted Defendant, or anyone in Defendant's position, to retain their PII/PHI had they known the reality of Defendant's inadequate data security practices.

231.    Defendant breached its fiduciary duties to Plaintiff and Class members by publishing their PII/PHI online, and failing to sufficiently encrypt or password protect Plaintiff's and Class members' PII/PHI.

232.    Defendant also breached its fiduciary duties to Plaintiff and Class members by failing to diligently discover, investigate, and give notice of the Cybersecurity Incident within a reasonable and practicable time period.

233.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

<u>**SEVENTH CAUSE OF ACTION**</u>
**Declaratory Judgment**
**(On Behalf of Plaintiff and the Class)**

234.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

235.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant

further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

236.     In the fallout of the Cybersecurity Incident, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiff alleges that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiff and Class members continue to suffer injury from the ongoing threat of fraud and identity theft.

237.     Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a.     Defendant owed—and continues to owe—a legal duty to refrain from publishing patient and employee PII/PHI online:

    b.     Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

    c.     Defendant has a duty to notify impacted individuals of the Cybersecurity Incident under the common law and Section 5 of the FTC Act;

    d.     Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

    e.     Defendant's breaches of its duties caused—and continues to cause—injuries to Plaintiff and Class members.

238.     The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

239.     If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences another Cybersecurity Incident.

240.    And if another Cybersecurity Incident occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiff and Class members' injuries.

241.    If an injunction is not issued, the resulting hardship to Plaintiff and Class members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

242.    An injunction would benefit the public by preventing another Cybersecurity Incident—thus preventing further injuries to Plaintiff, Class members, and the public at large.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of all others similarly situated, prays for relief as follows:

    a.  For an order certifying the Class, and naming Plaintiff as representatives of the Class, and Plaintiff's attorneys as Class Counsel;

    b.  For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

    c.  For damages in an amount to be determined by the trier of fact;

    d.  For an order of restitution and all other forms of equitable monetary relief;

    e.  Declaratory and injunctive relief as described herein;

    f.  Awarding Plaintiff reasonable attorneys' fees, costs, and expenses as otherwise allowed by law;

    g.  Awarding pre- and post-judgment interest on any amounts awarded; and

    h.  Awarding such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the putative Class, demands a trial by jury of all claims so triable.

Dated: August 25, 2025                    Respectfully submitted,

*/s/   Terence R. Coates*
Terence R. Coates (0085579)
Dylan J. Gould (0097954)
**MARKOVITS, STOCK & DEMARCO, LLC**
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
tcoates@msdlegal.com
dgould@msdlegal.com

Raina C. Borrelli (*pro hac vice* anticipated)
STRAUSS BORRELLI, PLLC
980 N. Michigan Ave., Suite 1610
Chicago, Illinois 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com

*Attorneys for Plaintiff and the Proposed Class*