**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**

**IN RE OHIO MARIUANA CARD DATA BREACH LITIGATION**

**Case No. 1:25-cv-01765-PAB**

**JUDGE PAMELA A. BARKER**

**MEMORANDUM OPINION & ORDER**

Currently pending before the Court is Defendant Ohio Medical Alliance LLC dba Ohio Marijuana Card's ("OMA" or "Defendant") Motion to Dismiss (the "Motion"). (Doc. No. 11.) Plaintiffs Kathy Burgess, Kirk Burd, Kristopher Cooper, James Hammond, Jaclyn Hammond, John Doe, and James Jindra ("Plaintiffs") filed an Opposition on February 19, 2026, to which OMA replied on March 19, 2026. (Doc. Nos. 12, 13.) For the following reasons, OMA's Motion to Dismiss is DENIED.

## I. Allegations in the Consolidated Class Action Complaint

### A. OMA operates a telemedicine business that requires its patients to disclose private information to OMA

OMA operates under the brand "Ohio Marijuana Card." (*Id.* at ¶ 29.) "This company is a telemedicine and in-person provider that helps clients obtain physician-certified medical marijuana cards." (*Id.*) "OMA facilitates evaluations for a wide range of qualifying health conditions through state-licensed doctors." (*Id.*) "Headquartered in Independence, Ohio (a Cleveland suburb), OMA has marijuana doctor office locations located in or near every major city in Ohio, as well as clinics in Arkansas, Kentucky, Louisiana, Virginia, and West Virginia." (*Id.* at ¶ 30.) "According to their website, OMA has helped over 340,000 patients nationwide access medical marijuana." (*Id.* at ¶ 11.)

Plaintiffs allege "[o]n information and belief, OMA accumulates highly sensitive Private Information of its patients and employees, including information protected by HIPAA." (*Id.* at ¶ 31.)

"In collecting and maintaining its patients' and employees' Private Information, OMA agreed it would safeguard the data in accordance with state law and federal law." (*Id.* at ¶ 32.) "Indeed, in its Privacy Policy, OMA falsely states, 'Ohio Medical Alliance uses reasonable and appropriate security measures to safeguard the information that has been collected from you via the public or Secure Website Services. Among the measures that Ohio Medical Alliance has implemented for its websites are administrative, physical and technical safeguards.'" (*Id.* at ¶ 33.) "OMA also claims, 'When you visit Ohio Medical Alliance's public websites, no personal information—such as your name, date of birth or telephone number —is collected, unless you provide us with that information voluntarily. Ohio Medical Alliance will not sell, license, transmit or disclose this information outside of Ohio Medical Alliance and its affiliated companies unless (a) expressly authorized by you, (b) necessary to enable Ohio Medical Alliance's contractors or agents to perform certain functions for us, or (c) required or permitted by law. In all cases, we will disclose the information consistent with applicable laws and regulations and we will require the recipient to protect the information and use it only for the purpose it was provided.'" (*Id.* at ¶ 34.)

Plaintiffs allege "on information and belief [that] OMA has not implemented reasonable cybersecurity safeguards or policies to protect the Private Information of its patients and employees or trained its IT or data security employees to prevent, detect, and stop breaches of its systems." (*Id.* at ¶ 35.) "As a result, OMA publicly exposes hundreds of thousands of records containing highly sensitive Private Information, allowing cybercriminals to exploit and gain access to its patients and employees' Private Information." (*Id.*)

"As a condition of receiving medical services from Defendant, Plaintiffs were required to provide their Private Information to Defendant, including at least their names, dates of birth,

addresses, phone numbers, email addresses, and financial account information, as well as the fact that they sought Defendant's services for medical purposes." (*Id.* at ¶ 36.) Plaintiffs allege "[o]n information and belief, Defendant collects and maintains its patients and employees' unencrypted Private Information in its computer systems." (*Id.* at ¶ 37.) "In collecting and maintaining Plaintiffs' and Class Members' Private Information, Defendant implicitly and explicitly agreed that it will safeguard the data using reasonable means according to state and federal law." (*Id.* at ¶ 38.)

**B. OMA's patient information is accessible to the public for an unknown period of time**

On August 19, 2025, "a cybersecurity researcher discovered a publicly exposed database that contained 957,434 records, with a total size of 323 GB, belonging to OMA." (Doc No. 9, ¶ 2.)[1] "The cybersecurity researcher who discovered the database immediately sent notice to OMA, and although OMA did not reply or notify its patients, the database was restricted from public access the following day." (*Id.* at ¶ 10.) "It is not known how long the database was exposed before the researcher discovered it." (*Id.*)

"For an unknown period of time prior to August 19, 2025, OMA exposed 957,434 records, with a total size of 323 GB, containing extremely sensitive information, including Social Security numbers, driver's licenses or identification documents that contained names, physical addresses, dates of birth, driver's license numbers and other Private Information." (*Id.* at ¶ 39.) "The publicly available database included high-resolution images of driver's licenses or identification documents that contained names, physical addresses, dates of birth, and driver's license numbers, as well as

[1] OMA points the court to an article written by the "cybersecurity researcher." (Doc. No. 11, PageID #230–31.) OMA portrays him as a "Trespasser" who "committed criminal computer trespass when he intentionally gained access to OMA's system without authorization or authority." (*Id.* at PageID #230.) OMA asserts that the Court can consider the article because it is incorporated by reference in the complaint. Plaintiffs do not dispute that the Complaint incorporated the article by reference. (Doc. No. 12, PageID #262.)

complete copies of debit and credit cards." (*Id.* at ¶ 4.) "The folders were labeled with the first and last names of patients and contained intake forms, medical records, release forms, physician certification forms with Social Security numbers, mental health evaluations, and identification documents from multiple states." (*Id.*) "These medical documents indicated patients' diagnosis and the reason they were seeking to be prescribed medical marijuana." (*Id.*) "The publicly available database also contained a large volume of internal communications, notes about clients, appointments, status, or personal situations—including an estimated 210,620 email addresses of clients and internal employees or business partners." (*Id.* at ¶ 5.) "Aside from PHI, highly sensitive PII was also publicly available for an unknown amount of time, including Social Security numbers." (*Id.* at ¶ 9.)

The Amended Complaint also contains screenshots of "a sample of just some of the records belonging to OMA patients and employees, made publicly available to anyone with internet access," which includes "identification documents in the exposed database," "a patient health summary," "segments of medical record documentation containing diagnosed health condition," and a document "containing client interactions, including PHI (such as HIV diagnoses), names, email addresses, and more." (*Id.* at ¶¶ 40–44.)

"[A]ll [of] this information was made publicly available—posted online, unencrypted and without password protection—to anyone with internet access." (*Id.* at ¶ 45.) "It is unclear when OMA first exposed these records, how long the Data Breach lasted, and when Defendant discovered the Data Breach." (*Id.* at ¶ 46.)

"Despite knowing that its patients' and employees' Private Information were publicly available online for an unknown amount of time, Defendant has failed to notify victims of the Data

Breach." (*Id.* at ¶ 50.) "Thus, Defendant continues to keep the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner." (*Id.* at ¶ 51.) "In so doing, Defendant has deprived and continues to deprive Plaintiffs and the Class of the earliest opportunity to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach." (*Id.*) "Moreover, Defendant has not reported the Data Breach to California regulators or the HHS, despite its obligations to do so." (*Id.* at ¶ 54.) "Defendant has intentionally failed to inform Plaintiffs and Class Members of the Data Breach." (*Id.* at ¶ 58.)

### C. Plaintiffs allege that OMA failed to adhere to relevant guidelines and industry standards

"The fact that over 323 GB of data was publicly exposed by OMA demonstrates that Defendant's cyber and data security systems were completely inadequate." (*Id.* at ¶ 47.) "As such, OMA allowed anyone with access to the internet to obtain files containing a treasure trove of hundreds of thousands of its patients and employees' Private Information." (*Id.*) "Defendant knew, or should have known, of the risks of posting its patients' and employees' Private Information online, as well as failing to encrypt or password protect it." (*Id.* at ¶ 48.) "In light of the information readily available and accessible before and during the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' Private Information could be accessed and exfiltrated, because of its public posting online." (*Id.* at ¶ 49.)

"Despite its duties to safeguard Private Information, Defendant did not follow industry standard practices in securing patients' and employees' Private Information, as evidenced by the Data Breach." (*Id.* at ¶ 52.) "Defendant's failure to adopt adequate cybersecurity measures demonstrates that there is a substantial risk of another cybersecurity incident, or that another cybersecurity incident

is certainly impending." (*Id.* at ¶ 53.) Plaintiffs further allege "[o]n information and belief, Defendant failed to adequately train its IT and data security employees on reasonable cybersecurity protocols or implement reasonable security measures, resulting in public access to hundreds of thousands of records containing its patients and employees' Private Information. Defendant's negligence is evidenced by its failure to prevent the Data Breach, and to stop the public, writ large (including cybercriminals) from accessing the Private Information it stored in its databases." (*Id.* at ¶ 57.)

"In a cybersecurity incident of this nature, a series of failures contributed to the resulting exposure." (*Id.* at ¶ 235.) "Here, cybercriminals did not need to penetrate OMA's systems at all; OMA had already made its patients' records publicly accessible online to anyone with an internet connection." (*Id.*)

**1. OMA allegedly failed to adhere to FTC guidelines**

"[T]he FTC has published guidelines that establish reasonable data security practices for businesses." (*Id.* at ¶ 236.) "The guidelines also emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks." (*Id.*; *see also id.* at ¶ 238.) "The guidelines explain that businesses should: a. protect the personal consumer information that they keep; b. properly dispose of personal information that is no longer needed; c. encrypt information stored on computer networks; d. understand their network's vulnerabilities; and e. implement policies to correct security problems." (*Id.* at ¶ 239.) "The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach." (*Id.* at ¶ 240.) "The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use

industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures." (*Id.* at ¶ 241.)

"The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ('FTCA'), 15 U.S.C. § 45." (*Id.* at ¶ 242.) "Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations." (*Id.*)

"Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to employees' and patients' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45." (*Id.* at ¶ 243.)

**2. OMA allegedly failed to follow industry standards**

"[S]everal industry standard best practices have been identified that—at a minimum—should be implemented by businesses like Defendant." (*Id.* at ¶¶ 237, 244.) "These industry standards include: educating all employees regarding cybersecurity; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption (making data unreadable without a key); multi factor authentication; backup data; and limiting which employees can access sensitive data." (*Id.* at ¶ 244.) "Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points." (*Id.* at ¶ 245.) "Moreover,

companies should retain personal data only as necessary, with legal justification. Personal data should not be stored beyond the time necessary to achieve its initial purpose of collection. In line with industry standard practices, Defendant should have promptly deleted the data belonging to former employees and patients." (*Id.* at ¶ 246.)

Plaintiffs allege "[u]pon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness." (*Id.* at ¶ 247.) "These frameworks are applicable and accepted industry standards, yet Defendant ignored these standards and made hundreds of thousands of patient records available online, for anyone with internet to view and download." (*Id.* at ¶ 248.)

**3. Defendants allegedly violated HIPAA**

"HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII and PHI is properly maintained." (*Id.* at ¶ 249.) "The Data Breach itself resulted from a combination of inadequacies showing Defendant failed to comply with safeguards mandated by HIPAA." (*Id.* at ¶ 250.) "Defendant's security failures include, but are not limited to:"

- failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

- failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

- failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

- failing to ensure compliance with HIPAA security standards by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

- failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

- failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

- failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

- failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

- failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

(*Id.*)

"Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrated Defendant failed to comply with safeguards mandated by HIPAA regulations." (*Id.* at ¶ 251.)

**D. Plaintiffs allegedly are harmed by the data breach**

**1. Plaintiffs' Common Experiences and Injuries**

Plaintiffs are current and former patients of OMA. (*Id.* at ¶¶ 59, 78, 96, 114, 132, 149, 167.) "Thus, Defendant obtained and maintained Plaintiff[s]' Private Information." (*Id.* at ¶¶ 60, 79, 97, 115, 133, 150, 168.) "As a result, Plaintiff[s] [were] injured by Defendant's Data Breach." (*Id.* at ¶¶ 61, 80, 98, 116, 134, 151, 169.)

"Plaintiff[s] [are] very careful about the privacy and security of [their] Private Information." (*Id.* at ¶¶ 62, 81, 99, 117, 135, 152, 170.) "[They] [do] not knowingly transmit [their] Private Information over the internet in an unsafe manner." (*Id.*) They are "careful to store any documents containing [their] Private Information in a secure location." (*Id.*)

"As a condition of receiving medical services, Defendant required Plaintiff[s] to provide [their] Private Information, including at least [their] name, date of birth, address, phone number, email address, and financial account information, as well as the fact that [they] sought Defendant's services for medical purposes." (*Id.* at ¶¶ 63, 82, 100, 118, 136, 153, 171.) "Plaintiff[s] provided [their] Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law." (*Id.* at ¶¶ 64, 83, 101, 119, 137, 154, 172.) "Defendant obtained and continues to maintain Plaintiff[s'] Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure." (*Id.*)

"Defendant deprived Plaintiff[s] of the earliest opportunity to guard [themselves] against the

Data Breach's effects by failing to promptly notify [them] about the Data Breach." (*Id.* at ¶¶ 65, 84, 102, 120, 138, 155, 173.) Plaintiffs allege that "on information and belief, [their] Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web." (*Id.* at ¶¶ 66, 85, 103, 121, 139, 156, 174.) "Through its Data Breach, Defendant compromised [their] Private Information." (*Id.* at ¶¶ 67, 86, 104, 122, 140, 157, 175.)

Plaintiffs have "spent—and will continue to spend—significant time and effort monitoring [their] accounts to protect [themselves] from identity theft." (*Id.* at ¶¶ 69, 87, 105, 123, 141, 158, 177.) "And in the aftermath of the Data Breach, Plaintiff[s] [have] also suffered from a spike in spam and scam emails, text messages, and phone calls." (*Id.* at ¶¶ 70, 88, 106, 124, 159, 178.)[2] Plaintiffs fear for their "personal financial security and worr[y] about what information was exposed in the Data Breach." (*Id.* at ¶¶ 71, 89, 107, 125, 142, 160, 179.) "Because of Defendant's Data Breach, Plaintiff[s] [have] suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration." (*Id.* at ¶¶ 72, 90, 108, 126, 143, 161, 180.) "Such injuries go far beyond allegations of mere worry or inconvenience." (*Id.*) Rather, Plaintiffs' "injuries are precisely the type of injuries that the law contemplates and addresses." (*Id.*)

Plaintiffs "suffered actual injury from the exposure and theft of [their] Private Information—which violates [their] rights to privacy." (*Id.* at ¶¶ 73, 91, 109, 127, 144, 162, 181.) Plaintiffs "suffered actual injury in the form of damages to and diminution in the value of [their] Private Information." (*Id.* at ¶¶ 74, 92, 110, 128, 145, 163, 182.) "After all, Private Information is a form of intangible property— property that Defendant was required to adequately protect." (*Id.*)

Plaintiffs "suffered imminent and impending injury arising from the substantially increased

[2] Plaintiff Jaclyn Hammond does not make this allegation.

risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed [their] Private Information right in the hands of criminals." (*Id.* at ¶¶ 75, 93, 111, 129, 146, 164, 183.) "Because of the Data Breach, Plaintiff[s] anticipate[] spending considerable amounts of time and money to try and mitigate [their] injuries." (*Id.* at ¶¶ 76, 94, 112, 130, 147, 165, 184.) "Today, Plaintiff[s] [have] a continuing interest in ensuring that [their] Private Information— which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches." (*Id.* at ¶¶ 77, 95, 113, 131, 148, 166, 185.)

In addition, "Plaintiff [Burgess] has already suffered from identity theft and fraud, whereby in the summer of 2025 an unauthorized actor attempted to take out a student loan using her information." (*Id.* at ¶ 68.) "Further, in the summer of 2024, Plaintiff [Burgess] received notification that an unauthorized actor attempted to open up a line of credit under her name, that she did not apply for." (*Id.*) "Plaintiff [Burgess] did not voluntarily, knowingly, or intentionally apply for any of these financial services." (*Id.*) Furthermore, "Plaintiff [Jindra] has already suffered from identity theft and fraud, whereby— approximately six months to one year prior—Plaintiff was enrolled in dozens, and potentially hundreds, of email subscription services within a single morning. Plaintiff [Jindra] did not voluntarily, knowingly, or intentionally subscribe to any of these services." (*Id.* at ¶ 167.)

**2. Plaintiffs and the Class Allegedly Suffered Common Injuries and Damages**

"Plaintiffs and members of the proposed Class have suffered injury from the misuse of their Private Information that can be directly traced to Defendant." (*Id.* at ¶ 186.) "As a result of Defendant's failure to prevent the Data Breach, Plaintiffs and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress." (*Id.* at ¶ 187.) "Plaintiffs and the Class have suffered or are at an increased risk of

suffering:"

a. Identity theft and fraud;

b. The loss of the opportunity to control how their Private Information is used;

c. The diminution in value of their Private Information;

d. The compromise and continuing publication of their Private Information;

e. Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

f. Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

g. Delay in receipt of tax refund monies;

h. Unauthorized use of Private Information made publicly available by OMA during the Data Breach; and

i. The continued risk to their Private Information, which remains in the possession of Defendant and is subject to further unauthorized disclosure so long as Defendant fails to undertake the appropriate measures to protect the Private Information in its possession.

(*Id.*)

**i. Plaintiffs allegedly face a significant risk of continued identity theft**

"Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach." (*Id.* at ¶ 188.) "The link between a Data Breach and the risk of identity theft is simple and well established." (*Id.* at ¶ 191.) "Criminals acquire individuals' personal data to

monetize the information." (*Id.*) "Sometimes criminals acquire Private Information by theft, as in a data breach, and sometimes criminals acquire Private Information due to wrongful disclosure or publication, as here." (*Id.*) "Criminals then monetize the data by selling the information on the internet black market (aka the dark web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below." (*Id.*)

"[H]ere, the data was not simply made available on the dark web, but made available online in general, and therefore it was accessible to anyone with internet access." (*Id.* at ¶ 192.) "Plaintiffs' and Class Members' unencrypted Private Information has already been available on the internet for an unknown period of time and will likely end up for sale on the dark web given the opportunistic nature of cybercrime." (*Id.* at ¶ 193.) "In addition, this unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without Plaintiffs' and Class Members' approval." (*Id.*) "Unauthorized individuals can easily access and have already easily accessed the Plaintiffs' and Class Members' Private Information." (*Id.*)

"Unauthorized disclosure of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced." (*Id.* at ¶ 194.) "To obtain a new number, a breach victim must demonstrate ongoing harm from misuse of their Social Security number, and a new Social Security number will not be provided until after the victim has suffered the harm." (*Id.*) "Due to the highly sensitive nature of Social Security numbers, theft of Social Security numbers in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity." (*Id.* at ¶ 195.)

"There may also be a time lag between when sensitive personal information is disclosed, when it is used, and when a person discovers it has been used." (*Id.* at ¶ 196.) "Fraud and identity theft

resulting from the Data Breach may go undetected until debt collection calls commence months, or even years later." (*Id.*) "An individual may not know that their Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud." (*Id.*) "Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected." (*Id.*) "For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information." (*Id.* at ¶ 197.)

"It is within this context that Plaintiffs and Class Members must now live with the knowledge that their PII is forever in cyberspace and was viewed and/or taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market." (*Id.* at ¶ 198.) "Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime." (*Id.* at ¶ 199.)

"For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security Number." (*Id.* at ¶ 200.) "Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails." (*Id.*) "Identity thieves can also use an individual's personal data and Private Information to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name

and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information." (*Id.* at ¶ 201.) "In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name." (*Id.*)

"One example of criminals piecing together bits and pieces of compromised Private Information to create comprehensive dossiers on individuals is called 'Fullz' packages." (*Id.* at ¶ 202.) "These dossiers are both shockingly accurate and comprehensive." (*Id.*) "With 'Fullz' packages, cybercriminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to the data OMA made publicly online, for anyone to view and download"— "an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals." (*Id.*) "For example, they can combine the Private Information made publicly available by OMA, and with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.)." (*Id.*)

"The development of 'Fullz' packages means that the Private Information exposed in the Data Breach can easily be linked to data of Plaintiff[s] and the Class that is available on the internet." (*Id.* at ¶ 203.) "In other words, even if certain information such as emails, phone numbers, or credit card numbers was not included in the Private Information disclosed online by OMA in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over." (*Id.*) "That is exactly what is happening to Plaintiffs and Class members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and Class Members' Private Information is being misused, and

that such misuse is fairly traceable to the Data Breach." (*Id.*)

"Defendant failed to rapidly report to Plaintiffs and the Class that their Private Information was available in the public domain, online, for anyone to view and download." (*Id.* at ¶ 205.) "Defendant's failure to promptly and properly notify Plaintiffs and Class members of the Data Breach exacerbated Plaintiffs' and Class members' injuries by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach." (*Id.*)

"Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts." (*Id.* at ¶ 206.) "In addition to out-of-pocket expenses that can exceed thousands of dollars, and the emotional toll identity theft can take, some victims must spend considerable time repairing the damage caused by the theft of their Private Information." (*Id.* at ¶ 207.) "Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors." (*Id.*)

"Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the Private Information procured in this Data Breach." (*Id.* at ¶ 208.) "To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come." (*Id.*)

**ii. Plaintiffs allegedly suffered loss of time to mitigate the risk of identity theft and fraud**

"As a result of the recognized risk of identity theft, when a Data Breach occurs, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the

incident, and otherwise mitigate the risk of becoming a victim of identity theft of fraud." (*Id.* at ¶ 209.) "Failure to spend time reviewing accounts or credit reports could expose the individual to greater financial harm, yet the asset of time has been lost." (*Id.*) "[D]ue to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate that harm." (*Id.* at ¶ 211.)

"Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing 'freezes' and 'alerts' with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover." (*Id.* at ¶ 212.) "Once Private Information is exposed, as here, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse." (*Id.* at ¶ 214.) "For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct that led to the unauthorized public disclosure of hundreds of thousands of records containing Private Information, in this Data Breach." (*Id.*)

**iii. Plaintiffs allegedly suffered diminished value of their private information**

"Personal data like Private Information is a valuable property right." (*Id.* at ¶ 215.) "As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and black markets, has been damaged and diminished in its value by its unauthorized release online by OMA, and likely release onto the dark web even though the database is no longer generally available to the public, [which] holds significant value for the threat actors." (*Id.* at ¶ 220.) "However, this transfer of value occurred without any consideration paid to

Plaintiffs or Class Members for their property, resulting in an economic loss." (*Id.* at ¶ 221.) "Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value." (*Id.*)

**iv. Plaintiffs allegedly face future cost of credit and identity theft monitoring**

"To date, Defendant has done nothing to provide Plaintiffs and Class Members with relief for the damages they have suffered due to the Data Breach." (*Id.* at ¶ 222.) "Given the fact that hundreds of thousands of records containing sensitive Private Information have been available in the public domain, online, for an unknown amount of time, there is a strong probability that the data has already been misused." (*Id.* at ¶ 223.) "Indeed, opportunistic cybercriminals have likely placed entire batches of Private Information on the dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes— e.g., opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or insurance; or filing false unemployment claims." (*Id.*) "Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future." (*Id.* at ¶ 227.)

"The retail cost of credit monitoring and identity theft monitoring can be $200 or more a year per Class Member." (*Id.* at ¶ 228.) "This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach." (*Id.*) "This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information." (*Id.*)

**v. Plaintiffs allegedly suffered a lost benefit of the bargain**

"Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain." (*Id.* at ¶ 229.) "When agreeing to provide their Private Information to

Defendant, Plaintiffs and Class Members, as employees and patients, understood and expected that they were, in part, paying for services and data security to protect the Private Information they were required to provide." (*Id.* at ¶ 230.) "Plaintiffs value data security. Indeed, data security is an important consideration when seeking employment and medical services." (*Id.* at ¶ 231.)

**II. Procedural Background**

This action is a consolidated class action brought by Plaintiffs against OMA related to the alleged Data Breach. (*See* Doc. No. 8.) On December 4, 2025, Plaintiffs filed a Consolidated Class Action Complaint (the "Complaint"). (Doc. No. 9.) Therein, Plaintiffs allege five claims: (1) negligence, (2) breach of implied contract, (3) unjust enrichment, (4) invasion of privacy, and (5) declaratory judgment.

On January 20, 2026, OMA filed the Motion. (Doc. No. 11.) On February 19, 2026, Plaintiffs filed their Opposition, to which OMA replied on March 19, 2026. Accordingly, the Motion is ripe for review.

**III. Standard of Review**

**A. Rule 12(b)(1)**

The standard of review of a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction depends on whether the defendant makes a facial or factual challenge to subject matter jurisdiction. *Wayside Church v. Van Buren County*, 847 F.3d 812, 816-17 (6th Cir. 2017). A facial attack "questions merely the sufficiency of the pleading" and requires the district court to "take[] the allegations in the complaint as true." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). To survive a facial attack, the complaint must contain a short and plain statement of the grounds for jurisdiction. *See Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383, 387 (6th Cir. 2016); *Ogle v. Ohio Civil Service Employees Ass'n, AFSCME, Local 11*, 397 F. Supp. 3d 1076,

1081-82 (S.D. Ohio 2019). By contrast, a factual attack "raises a factual controversy requiring the district court 'to weigh the conflicting evidence to arrive at the factual predicate that subject-matter does or does not exist.'" *Wayside Church*, 847 F.3d at 817 (quoting *Gentek Bldg. Prods., Inc.*, 491 F.3d at 330). The plaintiff has the burden of proving jurisdiction when subject matter jurisdiction is challenged. *Rogers v. Stratton Indus*., 798 F.2d 913, 915 (6th Cir. 1986). The court may allow "affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

**B. Rule 12(b)(6)**

In order to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting in part *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–556 (2007)). For purposes of Rule 12(b)(6), "all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (internal citation and quotation marks omitted).

The measure of a Rule 12(b)(6) challenge — whether the Complaint raises a right to relief above the speculative level — "does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Bassett v. National Collegiate Athletic Ass'n*., 528 F.3d 426, 430 (6th Cir. 2008) (quoting in part *Twombly,* 550 U.S. at 555–556). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (quoting in part *Erickson v. Pardus*, 551 U.S. 89 (2007)). Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679.

## IV. Analysis

OMA's Motion presents challenges under Rule 12(b)(1) and under Rule 12(b)(6). OMA argues that Plaintiffs lack standing to assert their claims. It further asserts that even assuming Plaintiffs have standing, their claims fail to state a claim upon which relief can be granted. As explained below, the Court first finds that Plaintiffs have sufficiently alleged that they have standing. The Court then finds that none of Plaintiffs' claims are subject to dismissal under Rule 12(b)(6). Accordingly, for the reasons stated more in depth below, OMA's Motion is denied.

### A. Plaintiffs have sufficiently alleged that they have standing

"Article III of the Constitution limits the judicial power of the United States to the resolution of 'Cases' and 'Controversies.'" *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 597 98

(2007) (alteration in original) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342, (2006)). The case-or-controversy requirement is satisfied only where a plaintiff has standing. *See Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 273 (2008). As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing standing. *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016). "Whether a plaintiff has standing to sue is 'determined as of the time the complaint is filed.'" *Sullivan v. Benningfield*, 920 F.3d 401, 407 (6th Cir. 2019) (quoting *Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 524 (6th Cir. 2001)).

"Standing consists of three elements: (1) an injury in fact that is (2) fairly traceable to the defendant's challenged conduct, and (3) likely to be redressed by a favorable judicial decision." *Burt v. Playtika, Ltd.*, 132 F.4th 398, 403 (6th Cir. 2025) (citing *Spokeo*, 578 U.S. at 338). In other words, "[w]ithout the plaintiff suffering an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Id.* (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). OMA only disputes the first two elements. The Court addresses each element in turn below.

**1. The Complaint sufficiently alleges an injury-in-fact**

OMA argues that "Plaintiffs' limited allegations of actual injury are conclusory and lack the requisite traceability to establish Article III standing." (Doc. No. 11, PageID #235.) OMA asserts that "[t]he majority of the Plaintiffs allege nothing more than fear of future injury or increased spam." (*Id.*) With respect to the allegations of spam, OMA argues that "even where occurrence of a data breach is established, spam allegations do not automatically constitute a concrete injury for standing." (*Id.*) OMA further argues that "there are no factual allegations to support the conclusion that any Plaintiffs' phone number or email were accessed or misused by the Trespasser, and there is no

allegation that Plaintiffs' information was found on the dark web." (*Id.* at PageID #236.) Instead, according to OMA, "Plaintiffs allege only, that the Trespasser published the Article, and they experienced increased spam, therefore, OMA must be liable for damages." (*Id.*)[3]

OMA argues in its Reply, with respect to Plaintiff Burgess, that while "Plaintiff Burgess alleges something akin to an injury in-fact," "[s]he does not allege the date of the attempt, or the loan processor, or the amount" and "does not allege that the information needed to effectuate such fraud was contained in the OMA database, or that the Trespasser accessed and used that information." (*Id.* at PageID #235.) According to OMA, "[s]he does allege that in the summer of 2024, before the Incident, she also suffered a fraud attempt." (*Id.*)

The Complaint alleges several theories of how Plaintiffs were injured. The Court need not address each of these theories, because at least one carries the day. Courts in this Circuit have found that an increase in spam is sufficient to establish an actual injury for purposes of standing. *See Dickson v. Direct Energy, LP*, 69 F.4th 338, 345 (6th Cir. 2023); *In re Bon Secours Mercy Health Data Breach Litig.*, No. 1:24-cv-594, 2025 U.S. Dist. LEXIS 126123, at *12 (S.D. Ohio July 2, 2025) ("Ultimately, the Court concludes that each Plaintiff has alleged an already-incurred actual injury—either identity theft and fraud or spam and harassment—sufficient to confer Article III standing. So the Court need not address the various other theories Plaintiffs present"); *Doe v. Mission Essential Grp., LLC*, No. 2:23-cv-3365, 2024 U.S. Dist. LEXIS 148732, at *17 (S.D. Ohio Aug. 20, 2024) ("Despite the explicit conjecture in these allegations, the Court will consider the receipt of unsolicited

[3] OMA also argues that Plaintiffs cannot establish an actual injury based on (i) diminution of value of personal information, (ii) misuse of data, (iii) loss of bargain, (iv) invasion of privacy, and (v) anxiety. (Doc. No. 11, PageID #236–39.) OMA also argues that Plaintiff cannot establish an imminent injury. (*Id.* at PageID #2394–41.) Because the Court finds that Plaintiffs can establish an actual injury through allegations of increased spam, the Court need not address these arguments.

commercial email communications to be a concrete harm, particularly in light of Plaintiff's sensitive geopolitical military background"); *Tate v. EyeMed Vision Care, LLC*, No. 1:21-cv-36, 2023 U.S. Dist. LEXIS 175840, at *16 (S.D. Ohio Sept. 29, 2023) (finding that "Plaintiffs adequately allege a concrete and particularized injury—if barely" because "Plaintiffs claim that, after the data breach, they received a significantly increased number of scam and phishing calls, texts, and emails"). And here, other than Plaintiff Jaclyn Hammond, Plaintiffs allege that "in the aftermath of the Data Breach, [they have] also suffered from a spike in spam and scam emails, text messages, and phone calls." (Doc. No. 9, ¶¶ 70, 88, 106, 124, 159, 178.)

In addition, Plaintiff Burgess alleges that she "has already suffered from identity theft and fraud, whereby in the summer of 2025 an unauthorized actor attempted to take out a student loan using her information" and that she "in the summer of 2024, Plaintiff received notification that an unauthorized actor attempted to open up a line of credit under her name, that she did not apply for." (*Id.* at ¶ 68.) And Plaintiff Jindra alleges that he "has already suffered from identity theft and fraud, whereby—approximately six months to one year prior—Plaintiff was enrolled in dozens, and potentially hundreds, of email subscription services within a single morning. Plaintiff did not voluntarily, knowingly, or intentionally subscribe to any of these services." (*Id.* at ¶ 176.) These allegations are also sufficient to establish an injury-in-fact. *See Bon Secours*, 2025 U.S. Dist. LEXIS 126123 at *13 ("And Smalls claims that someone opened a fraudulent credit card in her name after the breach . . . That sort of actual misuse of a plaintiff's PII (if that is indeed what happened here) qualifies as a concrete injury").

OMA attempts to distinguish *Tate* on the grounds that "there are no factual allegations to support the conclusion that any [of] Plaintiffs' phone number[s] or email[s] were accessed or misused

by the Trespasser, and there is no allegation that Plaintiffs' information was found on the dark web." (Doc. No. 11, PageID #236.) Not so. Plaintiffs have not alleged that the "Trespasser" was the only person to access their information. They allege that records belonging to "OMA patients and employees" were "made publicly available to anyone with internet access." (Doc. No. 9, ¶ 40.) They further allege that "[i]t is unclear when OMA first exposed these records, how long the Data Breach lasted, and when Defendant discovered the Data Breach." (*Id.* at ¶ 46.) They also allege that "on information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web." (*Id.* at ¶¶ 66, 85, 103, 121, 139, 156, 174.) Although this allegation is made "on information and belief," the Court finds that this allegation is plausible given the alleged increase in spam and Plaintiff Burgess' alleged experience with identify theft.

Simply put, viewing the allegations in Plaintiffs' favor, as the Court must do, it is plausible that Plaintiffs' information was in the publicly exposed database and that they suffered an increase of spam as a result. Accordingly, the Complaint adequately alleges an injury-in-fact for purposes of standing.

**2. The Complaint sufficiently alleges traceability**

OMA next argues that "none of the Plaintiffs' alleges injuries are fairly traceable to OMA or the Incident." (Doc. No. 11, PageID #242.) OMA asserts that "they cannot plead that a data breach occurred and, regardless, that their phone numbers or financial account information were impacted as a result and then misused to cause them injury." (*Id.*) According to OMA, "Plaintiffs rely solely on the Article to form the basis of the Complaint, while simultaneously ignoring the representations in the Article that no PII or PHI was retained or misused by Fowler." (*Id.*) OMA next argues that

"Burgess has not alleged any facts supporting the conclusion that a fraudulent student loan application is related to the Incident." (*Id.* at PageID #243.) OMA then argues that Plaintiffs allegations concerning "Fullz" packages is insufficient to establish traceability. (*Id.*)

Plaintiffs assert that they "allege [that] they experienced a substantial increase in spam traceable to OMA's publication of their Private Information on the internet; plausible so, since email addresses were implicated in the Breach." (Doc. No. 12, PageID #270.) According to Plaintiffs "[t]his all happened after OMA obtained their data despite the fact that Plaintiffs are careful about their data privacy and security." (*Id.*)

OMA argues in its Reply that "[i]f we assume, arguendo, that Plaintiffs adequately alleged their information was actually disclosed, they still fail to allege actual misuse of that private information." (Doc. No. 13, PageID #293.) It asserts that "Plaintiff Burgess did not allege any facts to support the conclusion that the Trespasser accessed the personal information necessary to apply for . . . a student loan in her name." (*Id.*) OMA asserts that "[t]he Court in *Doe* addresses the plaintiff's failure to trace an alleged injury to the defendant, stating that the plaintiff failed to allege his email address was accessed during the data incident, and therefore, he cannot trace increased spam to the data incident." (*Id.*) And here, according to OMA, "Burgess's claims are similarly deficient. Burgess asks the Court to conclude that because she provided her information to OMA, her Social Security number and other information was, in fact, disclosed to the Trespasser and subsequently misused by the Trespasser." (*Id.*)

The Court disagrees with OMA. In making this conclusion, the Court finds *Bon Secours* instructive. There, the Court found that an increase in spam and identify theft was sufficient to establish an injury-in-fact. *Bon Secours*, 2025 U.S. Dist. LEXIS 126123 at *13. The Court then

found that the plaintiffs sufficiently alleged causation:

> Alleging an injury-in-fact, however, isn't Plaintiffs' only hurdle. They must also allege causation. On that front, Speights, Smalls, and Lausche alike allege that they are "very careful about sharing [their] sensitive information." (Doc. 13, #104, 107, 109). And they each attribute the harm they incurred—unauthorized transactions, opening of a fraudulent credit card, and increased spam communications—to the data breach. (*Id.*). Said differently, without expressly alleging that the data breach "caused" their injuries, Plaintiffs claim[] those injuries are fairly traceable to it. *Tate*, 2023 U.S. Dist. LEXIS 175840, 2023 WL 6383467, at *6 (citing *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 715 (6th Cir. 2015)). That's a plausible allegation given that Plaintiffs' names, birthdates, Social Security numbers, and addresses were divulged in the breach. (Doc. 17-1, #192). Even more so in light of Plaintiffs' allegation that bad actors can utilize Fullz packages—dossiers of information containing individuals' personal information—to link individuals' compromised PII with publicly available information and effectuate identity theft, fraud, or spam communications. (Doc. 13, #100). Taken together, it's at least plausible, which is all that matters for the standing inquiry at this stage, that Plaintiffs' injuries are sufficiently traceable to the data breach.

*Id.* at *13–14.

Plaintiffs here make similar allegations. They allege that "[f]or an unknown period of time prior to August 19, 2025, OMA exposed 957,434 records, with a total size of 323 GB, containing extremely sensitive information, including Social Security numbers, driver's licenses or identification documents that contained names, physical addresses, dates of birth, driver's license numbers and other Private Information." (Doc. No. 9, ¶ 39.) They also allege that medical records were exposed, which "addresses, birthplace, health problems, medications, and more." (*Id.* at ¶ 42.) Further, Plaintiff Burgess alleges that she "has already suffered from identity theft and fraud, whereby in the summer of 2025 an unauthorized actor attempted to take out a student loan using her information" and that "in the summer of 2024, Plaintiff received notification that an unauthorized actor attempted to open up a line of credit under her name, that she did not apply for." (*Id.* at ¶ 68.) And, as explained above, other than Plaintiff Jaclyn Hammond, Plaintiffs allege that "in the aftermath of the Data

Breach, [they have] also suffered from a spike in spam and scam emails, text messages, and phone calls." (Doc. No. 9, ¶¶ 70, 88, 106, 124, 159, 178.) Moreover, Plaintiffs allege "[t]he development of "Fullz" packages means that the Private Information exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet" and that this "is exactly what is happening to Plaintiffs and Class members." (*Id.* at ¶ 203.)

Taking these allegations together, the Court finds that it is plausible that Plaintiff's injuries are fairly traceable to OMA's conduct here. *See Bon Secours*, 2025 U.S. Dist. LEXIS 126123 at *13–14; *see also Tate*, 2023 U.S. Dist. LEXIS 175840, at *16–17 ("While Plaintiffs do not explicitly allege that the data breach 'caused' that increased call volume, their point is clear—the increase is traceable to the data breach . . . This allegation is plausible given the nature of the incident").

The Court is not persuaded by OMA's reliance on *Doe*. The Court in *Doe* did find that the plaintiff alleged an actual injury but then found that the injury was not fairly traceable to the data breach at issue or the defendant's actions. *Doe*, 2024 U.S. Dist. LEXIS 148732 at *20. The court pointed to the fact that the plaintiff "does not allege that his email address was accessed during the Data Incident." *Id.* at *21. It further reasoned that "[a]lthough he insists that the PII possibly accessed in the Data Incident (including his name and Social Security number) can be 'combined' with other sources to create 'Fullz' packages that can be sold or used to commit fraud . . . chain of events relies not only upon the assumption that PII in MEG's possession was improperly accessed, but also upon speculation about the actions of independent actors in combining the PII with information obtained elsewhere." *Id.* at *20–21. As explained above, the allegations here go farther than those at issue in *Doe*. And unlike in *Doe*, Plaintiffs plausibly allege that their "Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web." (*Id.* at ¶¶ 66,

85, 103, 121, 139, 156, 174.)

Having found that the Plaintiffs have sufficiently alleged an injury-in-fact and causation, and given OMA's non-objection to redressability,[4] the Court finds that Plaintiffs have Article III standing to pursue their claims. The Court therefore denies OMA's request to dismiss this action for lack of subject matter jurisdiction.

### B. Plaintiffs' Complaint states a claim upon which relief can be granted

The Court next addresses OMA's Rule 12(b)(6) arguments. OMA argues first that Plaintiffs cannot plausibly allege damages. It then challenges each of Plaintiffs' claims. The Court addresses each argument in turn below.[5]

#### 1. The Court rejects OMA's argument that Plaintiffs have not plausibly alleged damages

OMA argues that "Plaintiffs do not meet the bar to sufficiently plead injury-in-fact to establish standing, and so they cannot possibility plead a cognizable loss to sustain any of their claims for damages." (Doc. No. 11, PageID #244.) Because the Court has found that Plaintiffs have pled an injury-in-fact sufficient to establish standing, the Court rejects this argument.[6]

#### 2. Plaintiffs have alleged a plausible negligence claim

Under Ohio law, a negligence claim requires Plaintiffs to plead "[1] the existence of a duty,

---

[4] The Court independently finds that Plaintiffs' alleged injuries are redressable. *See Bon Secours*, 2025 U.S. Dist. LEXIS 126123 at *14.

[5] OMA asserts in the Reply for the first time that the Complaint fails to state a claim because "Plaintiffs have not, and cannot, allege that their information was contained in the subject database, or that it was disclosed to the Trespasser." This blanket argument was not raised in Motion, and therefore, is waived. Regardless, as explained above, the Complaint plausibly alleges that Plaintiffs' information was contained in the subject database and that it was accessed by someone other than the Trespasser.

[6] OMA argues in its Reply that "[e]ven if, however, we assume, arguendo, that Plaintiffs have adequately alleged that their personal information was present in the subject database, and that it was disclosed to the Trespasser, Plaintiffs still have not adequately alleged damages." (Doc. No. 13, PageID #294.) This argument was not raised in OMA's Motion and is therefore waived.

[2] a breach of that duty, and [3] an injury that was proximately caused by the breach." *Rieger v. Giant Eagle, Inc.*, 138 N.E.3d 1121, 1125 (Ohio 2019). OMA challenges each element. For the reasons set forth below, the Court finds that the Complaint plausibly alleges each element of a negligence claim under Ohio law.

**i. The Complaint plausible alleges the existence of a duty**

OMA argues that "Plaintiffs cannot point to any common law duty." (Doc. No. 11, PageID #245.) OMA then argues that "Plaintiffs allege duty stemming from Section 5 of the FTC Act and the OPHI." (*Id.*) But, according to OMA, "this Court has previously rejected such attempts because the FTC Act does not create a private party duty which Plaintiffs can sue to enforce or redress" and that "this Court has held that HIPAA cannot be the basis of a negligence per se theory of recovery." (*Id.*)

Plaintiffs argue in their Opposition that "[a] corporation like OMA that regularly solicits and maintains Private Information undertakes a duty to protect the integrity of that data." (Doc. No. 12, PageID #275.) According to Plaintiffs, "courts have concluded that entities collecting Social Security numbers or PHI have a duty to protect their customers from foreseeable harm." (*Id.* at PageID #275.) Plaintiffs further assert that "although there is no express private right of action under the Ohio Revised Code, it does provide a safe harbor for businesses that maintain industry standard security measures" and that this district has recognized that 'the existence of this statutory safe harbor "presumes that such covered businesses have a duty to protect such data' because without a common law duty, there would be no need for the safe harbor statute." (*Id.* at PageID #276–77.) Plaintiffs also argue that they can establish a duty based "on OMA's violations of Ohio Rev. Code Ch. 3798." (Doc. No. 12, PageID #279.)

OMA argues in its Reply that Plaintiff's reliance on *Stasi v. Inmediata Health Grp. Corp*., 501 F. Supp. 3d 898, 912 (S.D. Cal. 2020) is misplaced because "[t]he court did not find that in every circumstance in which personal information is provided in exchange for services, a duty is created." (Doc. No. 13, PageID #297.) OMA does not respond to any of the other cases Plaintiffs rely on to support their argument that there is a common law duty and does not respond to Plaintiff's negligence *per se* argument.

In its Motion OMA points the Court to two decisions to support its argument that there is no common law duty to maintain private information. In *Marlin v. Associated Materials, LLC*, No. 5:23CV1621, 2024 U.S. Dist. LEXIS 91365 (N.D. Ohio May 22, 2024), the Court, without any analysis, found that the "Plaintiffs fail to identify any breach of any applicable standard of care . . . ." *Id.* at *12. The *Marlin* court, however, did not expressly find that Ohio law does not recognize a common law duty to protect PII. In *Brickman v. Maximus, Inc.*, No. 2:21-cv-3822, 2023 U.S. Dist. LEXIS 46038 (S.D. Ohio Mar. 17, 2023) the Court found that "absent the contract between Defendant and the State of Ohio, Defendant would have no obligation to store or safeguard Plaintiff's data." *Id.* at *9. Like the *Marlin* court, the *Brickman* Court, however, provided no analysis as to why the defendant "would have no obligation to store or safeguard Plaintiff's data."

By contrast, at least one Judge in this district has concluded that there is a common law duty to keep PII safe. *In re CBIZ Data Breach Litig.*, No. 1:24 CV 1722, 2025 U.S. Dist. LEXIS 103815, at *17 (N.D. Ohio June 2, 2025) ("Absent some direct guidance from the Ohio courts, or the Sixth Circuit applying Ohio law, this Court sees no reason to exempt businesses who collect PII from the general duty of reasonable care under common law negligence standards") (Nugent, J.); *Mulkey v. Roundpoint Mortg. Servicing Corp.*, No. 1:21 CV 01058, 2021 U.S. Dist. LEXIS 234110, at *8 (N.D.

Ohio Dec. 6, 2021) ("Accordingly, Plaintiffs' argument that Defendant owed them a duty to keep their PII safe is plausible") (Nugent, J.). In reaching that conclusion, Judge Nugent explained in *Mulkey*:

> Here, Plaintiffs allege a duty exists between them and Defendant to safeguard their PII. (ECF #1, 65). Plaintiffs assert Defendant violated that duty by voluntarily faxing Plaintiffs PII to unknown third parties, failing to exercise necessary care. (ECF #1, 71). Lastly, Plaintiffs state they were injured by Defendant's actions. (ECF #1, 73). While Ohio law does not explicitly impose a duty to protect PII on businesses that collect such information, it does provide a safe harbor statute. Under Ohio law, an affirmative defense exists for businesses against breach of data tort claims when they create certain protections for stored data, specifically PII. Ohio Rev. Code Ann. § 1354.01 (West). Therefore, the fact that a statute provides a statutory defense against breach of data implies that the law also presumes that such covered businesses have a duty to protect such data. Accordingly, Plaintiffs' argument that Defendant owed them a duty to keep their PII safe is plausible.

*Mulkey*, 2021 U.S. Dist. LEXIS 234110 at *7–8.

The Court finds Judge Nugent's analysis persuasive. OMA has not argued that Judge Nugent's decisions are flawed and has not provided the Court with any contrary binding authority. As Judge Nugent observed in *CBIZ*, absent any contrary guidance from Ohio courts or the Sixth Circuit, the Court likewise concludes that Ohio law recognizes a common law duty to safeguard PII. And here, Plaintiffs allege just that: "Defendant owed Plaintiffs and the Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiffs and the Class when obtaining, storing, using, and managing personal information, including taking action to reasonably safeguard such data and providing notification to Plaintiffs and the Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses." (Doc. No. 9, ¶ 270.) The Court, accordingly, finds that Plaintiffs allege a plausible duty of care.[7]

[7] Having found that Plaintiffs alleged a plausible common law duty, the Court declines to address the parties' arguments concerning Plaintiffs' reliance on negligence *per se* because, as explained in the next section, the Court finds that Plaintiffs

**ii. The Complaint alleges a plausible breach of the duty of care**

OMA next argues that '[t]he Complaint also fails to allege a breach of any duty that may exist." (Doc. No. 11, PageID #245.) OMA argues that "Plaintiffs do not allege any facts outside the Article, including any facts supporting their conclusion that their information was present in the folder the Trespasser claims to have accessed." (*Id.*) OMA asserts that "[i]f their information was not present in the folder, they cannot allege OMA breached a duty to them." (*Id.*) And, OMA argues, "[a]t most, Plaintiffs alleged they read the Article, and concluded that their information was accessed by the Trespasser." (*Id.*) And OMA argues that "in alleging breach, Plaintiffs conclude OMA failed to implement appropriate cybersecurity measures, based entirely on contents of the Article." (*Id.*)

Plaintiffs respond that "[w]hether [a] duty was breached is generally a question of fact that should be decided by a jury." (Doc. No. 12, PageID #278.) Plaintiffs argue that "[i]t is more than plausible that OMA failed to exercise reasonable care when it publicly disclosed Plaintiffs' Private Information on the internet without password protection or encryption." (*Id.*) OMA argues in its Reply that "[w]ithout facts to support the conclusion that Plaintiffs' conclusion that the Article created an impending future harm, it is not sufficient for Plaintiffs to assume breach, causation and damages." (Doc. No. 13, PageID #298.)

OMA's theory misreads that Complaint. As the Court explained above in its standing analysis, the Complaint plausibly alleges that Plaintiffs' information was contained in the database. And the Court finds there are sufficient allegations to support a breach here. Plaintiffs allege that "Defendant breached its duty of care by failing to adequately protect Plaintiffs' and Class Members'

allege a plausible breach of the common duty. Accordingly, at this time there is no need to address whether Plaintiffs can rely on negligence *per se* to support the duty and breach elements.

Private Information." (Doc. No. 9, ¶ 275.) This conclusion is supported by the following allegations included in Plaintiffs' Complaint. Plaintiffs allege that OMA "exposed" their private records and that this "information was made publicly available—posted online, unencrypted and without password protection—to anyone with internet access." (*Id.* at 39, 45.) Plaintiffs further allege that "OMA allowed anyone with access to the internet to obtain files containing a treasure trove of hundreds of thousands of its patients and employees' Private Information." (*Id.* at ¶ 47.) The Court accordingly finds that Plaintiffs allege a plausible breach of the duty of care. *See CBIZ*, 2025 U.S. Dist. LEXIS 103815 at *18 (finding allegations that PII was stored without encryption sufficient to establish breach of the duty of care).

**iii. The Complaint plausibly alleges causation**

In the Motion, OMA argues that "Plaintiffs have not alleged how their purported injuries, in the form of spam calls and an unauthorized loan application, with no resulting loss, were proximately caused by OMA." (*Id.* at PageID #246.) OMA asserts that "[t]he mere existence of the Article, informing the public at large of potential unauthorized access to OMA patient information, with representations that no information was retained or misused, fails to plausibly plead causation or injury." (*Id.*) Plaintiffs argue in their Opposition that "it is common sense that if Plaintiffs suffered injuries from the publication of their Private Information on the internet, their injuries were proximately caused by OMA because it was OMA (not a third party) that placed the Private Information on the internet." (Doc. No. 12, PageID #278.) They further argue that "[f]or the reasons discussed with respect to traceability above, Plaintiffs have adequately alleged proximate cause as well." (*Id.*) OMA argues in its Reply that "[w]ithout facts to support the conclusion that Plaintiffs' conclusion that the Article created an impending future harm, it is not sufficient for Plaintiffs to

assume breach, causation and damages." (Doc. No. 13, PageID #298.)

The Court agrees with Plaintiffs. For the same reasons explained above as to traceability, the Court finds that the Complaint sufficiently alleges causation. *Bon Secours*, 2025 U.S. Dist. LEXIS 126123 at *18 ("For the same reasons that Plaintiffs satisfied the traceability element for Article III standing, they likewise exceed the plausibility threshold for the causation element of their negligence claim"); *Tate*, 2023 U.S. Dist. LEXIS 175840 at *23–24 (finding plaintiffs sufficiently alleged the causation element based on allegations that the defendants "caused their injury because of the foreseeable nexus among EyeMed's lax security, the data breach, and the increased scam calls").

**iv. The economic loss rule does not bar Plaintiffs' negligence claim**

OMA's final argument concerning Plaintiffs' negligence claim is that it is barred by the economic loss rule. (Doc. No. 11, PageID #246.) OMA argues that "Plaintiffs' alleged damages (i.e., costs and expenses related to the Incident) are 'purely economic' and do not include any alleged harm to Plaintiffs' person or physical damage to Plaintiffs' property." (*Id.*) OMA concludes that "these purely economic losses are not recoverable under a negligence theory." (*Id.*)

Plaintiffs respond in their Opposition that "this District rejected that argument and explained that the economic-loss rule does not apply to a loss of privacy, which Plaintiffs have indeed alleged here, and that even where a plaintiff does allege purely economic loss, the economic-loss rule serves to bar only those negligence claims premised entirely upon the terms of a contract." (Doc. No. 12, PageID #277.) Plaintiffs argue that this Court should "hold that because Plaintiffs have alleged an independent common law duty, the economic-loss rule does not apply." (*Id.* at PageID #278.)

OMA asserts in its Reply that "Plaintiffs also attempt to argue that the economic loss rule does not apply to their damages claim for loss of privacy," but that "argument fails because Plaintiffs

have not actually alleged a loss of privacy." (Doc. No. 13, PageID #298.) OMA asserts that "Plaintiffs alleged only that they provided information to an entity and that entity suffered a security incident" and that "[t]hey concluded their information was impacted." (*Id.*) According to OMA, "[t]his is not sufficient to allege a loss of privacy." (*Id.*)

The economic loss doctrine "generally prevents recovery in tort of damages for purely economic loss." *Corporex Dev. & Constr. Mgmt. v. Shook, Inc.*, 835 N.E.2d 701, 704 (Ohio 2005). "In Ohio, the economic loss doctrine has two aspects. First, it bars a plaintiff from recovering in negligence for purely economic damages. Second, it prevents a plaintiff from recovering in tort for the conduct of a defendant that violates only a contractual duty rather than any free-standing duty of care." *Ross v. PennyMac Loan Servs. LLC*, 761 F. App'x 491, 496 (6th Cir. 2019) (internal citations omitted).

To support its economic loss argument, OMA points the Court to *Marlin* and *Tucker v. Marietta Area Health Care, Inc.*, No. 2:22-cv-184, 2023 U.S. Dist. LEXIS 13974 (S.D. Ohio Jan. 26, 2023). In *Tucker*, the Court concluded that the economic loss rule barred the plaintiffs' negligence claim because the alleged injuries of "invasion and loss of privacy, emotional distress, stress, anxiety, fear, nervousness, and anger" were purely economic in nature. *Tucker*, 2023 U.S. Dist. LEXIS 13974 at *9–11. In *Marlin*, the Court found, in *dicta*, without any analysis, that "Plaintiffs' inadequate claims regarding alleged negligence are barred by the economic loss doctrine, and Plaintiffs fail to identify any breach of any applicable standard of care or cognizable injury that would provide an exception." *Marlin*, 2024 U.S. Dist. LEXIS 91365 at *12. In reaching this conclusion, the *Marlin* court relied on *Tucker*.

In its Opposition, Plaintiffs point the Court to *Allen v. Wenco Mgmt., LLC*, 696 F. Supp. 3d

432 (N.D. Ohio 2023) and *Bon Secours*. In *Allen*, the court reasoned that injuries to "loss of privacy" were noneconomic in nature. *Allen*, 696 F. Supp. 3d at 440. It then found that the economic loss rule did not apply at all because the "alleged duty to better safeguard Allen's PII arose in tort, not in contract." *Id.* In *Bon Secours*, the Court reasoned that the economic loss rule did not apply because "Plaintiffs rely at least in part on a duty that arises under common law (as opposed to a contract)." *Bon Secours*, 2025 U.S. Dist. LEXIS 126123 at *25. The *Bon Secours* court did not address whether the plaintiffs' alleged injuries were economic or noneconomic in nature and based its decision solely on the source of the alleged duty to safeguard PII.

There is an obvious tension among these decisions. Under *Tucker* and *Marlin*, the dispositive question is whether the alleged damages are economic or noneconomic. Under *Allen* and *Bon Secours*, the dispositive question is whether the duty owed is covered by a contract or whether the duty owed is independent of a contract. This tension stems from these courts' differing interpretations of the Ohio Supreme Court's decision in *Corporex*. There, while the Ohio Supreme Court noted that "[t]he economic-loss rule *generally* prevents recovery in tort of damages for purely economic loss," its holding was that "the economic-loss rule bars a building project owner from recovery of purely economic damages in tort against a subcontractor, based upon breach of contractually created duties." *Corporex*, 835 N.E.2d at 703. The *Corporex* court noted that the economic loss rule "stems from the recognition of a balance between tort law, designed to redress losses suffered by breach of a duty imposed by law to protect societal interests, and contract law, which holds that 'parties to a commercial transaction should remain free to govern their own affairs.'" *Id.* (quoting *Chemtrol Adhesives v. Am. Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624, 628 (Ohio 1989)). And indeed, the *Corporex* opinion suggests that a party could recover solely economic losses under a tort theory. *Id.* at 706

("DSI fails to claim a breach of any duty imposed by law that would justify recovery of purely economic damages in tort.").

It follows then that the purpose of the economic loss rule is not to categorically bar economic damages based on a tort theory. "The Supreme Court of Ohio intended courts to apply the economic-loss rule to maintain the line between contract and tort, not to completely preclude recovery of all economic losses through an action in tort." *Boater's Emergency Serv., LLC v. Archon Hat 80, LLC*, No. 3:21 CV 2047, 2024 U.S. Dist. LEXIS 161146, at *5 (N.D. Ohio July 23, 2024) (quoting *Morgan v. Mikhail*, No. 08AP-87, 2008 Ohio App. LEXIS 3843 (Ohio App. 10th Dist. Sept. 11, 2008)); *accord CBIZ*, 2025 U.S. Dist. LEXIS 103815 at *24 (finding the economic loss rule did not apply when, among other things, "CBIZ owed no duty to the Plaintiffs based on any contract or other type of agreement between the parties"); *In re E. Palestine Train Derailment*, No. 4:23CV0242, 2024 U.S. Dist. LEXIS 44516, at *74 (N.D. Ohio Mar. 13, 2024) ("The doctrine bars tort recovery for purely economic harm only if the duty arose by contract, when the remedy is in contract law").

In *Boater's Emergency*, for example, the court found that the economic loss rule did not bar a negligence claim when there were no contract claims remaining in the case. *Id.* at *5. Likewise, in *E. Palestine*, the court reached the same conclusion when there were "no contract claims at issue in the case at bar." *Id.* at *73–74. Other courts are in accord. *Zak v. Airhart*, No. L-21-1052, 2021 Ohio App. LEXIS 4297, at *24 (Ohio App. 6th Dist. Nov. 19, 2021) ("Without any contractual duties, Airhart's position regarding application of the economic loss rule lacks merit, as the trial court considered only duties owed under tort law. Therefore, based on these findings of the trial court that no contract existed, we find the economic loss rule inapplicable in this case"); *Campbell v. Krupp*, 961 N.E.2d 205, 211 (Ohio App. 6th Dist. 2011) ("In contrast, the economic [loss] rule does not

apply—and the plaintiff who suffered only economic damages can proceed in tort—where the defendant breached a duty that did not arise solely from a contract"); *Morgan*, 2008 Ohio App. LEXIS 3843 at *38 ("Without the existence of a contract, the economic-loss rule is irrelevant"); *Bungard v. Dep't of Job & Family Servs.*, No. 07AP-447, 2007 Ohio App. LEXIS 5511, at *13 (Ohio App. 10th Dist. Nov. 27, 2007) ("In this case, however, the parties did not have a contract (see infra), which renders the economic loss rule inapplicable").

With this authority in mind, the Court therefore finds *Allen* and *Bon Secours* more persuasive than *Tucker* and *Marlin*.[8] Accordingly, the Court finds that Plaintiffs' negligence claim is not subject to dismissal under the economic loss rule.

For these reasons, the Court finds that Plaintiffs have stated a plausible negligence claim.

**3. The Complaint states a plausible claim for breach of implied contract**

OMA asserts that "Plaintiffs' theory underlying their implied contact claims is that OMA required Plaintiffs to provide or authorize the transfer of their privacy information for OMA's clients to provide services, and in exchange OMA entered into implied contracts in which OMA agreed to implement adequate data security measures." (Doc. No. 11, PageID #247.) But, OMA argues, "Plaintiffs do not allege the terms agreed to during this meeting of the minds, including what, if anything, Plaintiffs paid to OMA in exchange for data security and safeguards." (*Id.*) According to OMA, "Plaintiffs cannot plausibly rely on OMA's website or privacy policy statements because unilateral statements of fact alleged as to the safety of a customer's data do not create contractual

[8] The Court is cognizant that Plaintiffs have alleged an implied contract, which would invoke the economic loss rule. *See CBIZ*, 2025 U.S. Dist. LEXIS 103815 at *30, n.6 ("If the duty to safeguard the information originated from an implied promise offered in exchange for the receipt of the PII, it is very possible that the economic loss doctrine may then apply to negate and negligence claims asserting economic loss"). The Court, however, declines to dismiss Plaintiffs' negligence claim at this stage based on the alleged contract given that Plaintiffs are permitted to plead claims in the alternative. Fed. R. Civ. P. 8(a)(3).

obligations." (*Id.*)

Plaintiffs argue that "[c]ourts generally find it plausible that the provision of highly sensitive information, like diagnosis history and Social Security numbers, in exchange for a defendant's services implies a defendant's contractual duty to keep that data confidential and not publicly disclose it online— whether intentional or not." (Doc. No. 12, PageID #273.) Plaintiffs also argue that they have "bolstered their claim by pointing to a privacy policy that states OMA 'uses reasonable and appropriate security measures to safeguard the information that has been collected' because "it evidences OMA's understanding that it has an obligation to keep Plaintiffs' Private Information confidential." (*Id.* at PageID #274.) Finally, Plaintiffs argue that "Plaintiffs' Private Information was sufficient consideration to form a contract." (*Id.* at PageID #275.)

OMA argues in its Reply that "under Ohio law, "[g]eneral and aspirational policies regarding general concern for the security of PII are not sufficient to establish the existence of an enforceable contract." (Doc. No. 13, PageID #296.) OMA further argues that "Plaintiffs misstate the facts, even as they have alleged them, to claim that OMA publicly posted patient data, in violation of the implied agreement between the parties" because "as is clearly stated in the Article, the Trespasser gained access to a database via an alleged security vulnerability." (*Id.*)[9]

"The elements of an implied-in-fact contract are the same as those of an express contract: offer, acceptance, consideration, and a meeting of the minds." *Munger v. Matco Tools Corp.*, No. 5:23-cv-00337, 2026 U.S. Dist. LEXIS 98633, at *23 (N.D. Ohio May 5, 2026) (quoting *Randleman v. Fid. Nat'l Title Ins. Co.*, 465 F. Supp. 2d 812, 818 (N.D. Ohio 2006)). As explained by the Sixth

[9] OMA also raises, for the first time in its Reply that Plaintiffs also fail "to allege the breach, causation, and damages elements necessary to state a claim for breach of implied contract." (Doc No. 13, PageID #296.) Again, this argument is waived.

Circuit in the context of a motion to dismiss:

> Under Ohio law, an implied-in-fact contract exists where "a meeting of the minds is demonstrated by surrounding circumstances allowing a factfinder to infer the existence of a contract by tacit understanding." *Alpha Telecomm., Inc. v. Int'l Bus. Machs. Corp.*, 241 Fed. Appx. 301, 304-05 (6th Cir. 2007) (quoting *United Nat'l Ins. Co. v. SST Fitness Corp.*, 309 F.3d 914, 919 (6th Cir. 2002)) (applying Ohio law). Accordingly, a complaint must include a "description of the conduct from which to infer a meeting of the minds," to survive a motion to dismiss for breach of implied contract." *Byler v. Air Methods Corp.*, 823 F. App'x 356, 361-62 (6th Cir. 2020) (applying Ohio law and explaining that a plaintiff must allege facts showing mutual assent through conduct).

*Dean v. Chamberlain Univ., LLC*, No. 21-3821, 2022 U.S. App. LEXIS 16726, at *8 (6th Cir. June 16, 2022).

In the context of data breach cases, "[n]umerous courts have found an implied contract exists where a plaintiff alleges that she was required to turn over PII to obtain employment or a type of service." *Bon Secours*, 2025 U.S. Dist. LEXIS 126123, at *28 (citing, among other authorities, *Brooks v. Peoples Bank*, 732 F. Supp. 3d 765, 780 (S.D. Ohio 2024)). In *Bon Secours*, the court found that the plaintiffs alleged a plausible implied contract claim based on allegations "that they 'were required to provide Defendant with their [PII] in order to receive employment,' [] that Bon Secours, in turn, impliedly 'agreed to comply with its statutory and common law duties to protect their [PII],'" and "that Bon Secours was aware of its data protection and compliance duties, as evidenced by its website and Code of Conduct." *Id.* at *28. In *Brooks* the Court found:

> Here, Plaintiffs allege that they entered into an implied contract with Limestone under which Limestone required them to provide their PII as a condition of receiving its banking services. Am. Compl. ¶ 203, ECF No. 21. Plaintiffs further allege Limestone agreed under this implied contract to safeguard their PII and to timely notify Plaintiffs of any data breach. *Id.*
>
> Construing Plaintiffs' Amended Complaint in the light most favorable to them, Plaintiffs have adequately pleaded facts sufficient to state a claim for breach of an implied contract. From the facts alleged, it is reasonable to infer that when

> Plaintiffs entrusted Limestone with their money, which required Plaintiffs to disclose their PII to Limestone, Plaintiffs understood that Limestone would likewise protect their PII. It is further reasonable to infer that Limestone, a financial institution in the business of protecting customers' assets, undertook an implied contractual duty to take reasonable steps to protect Plaintiffs' PII, in exchange for Plaintiffs choosing to do their banking with Limestone. It would also be premature to determine at this stage that any implied contract did not include the duties Plaintiffs allege. *See, e.g., Foster v. Health Recovery Servs., Inc.*, 493 F. Supp. 3d 622, 640 (S.D. Ohio 2020) ("The terms of an implied in fact contract are determined by the Court based upon the facts and circumstances surrounding the transaction." (cleaned up; citing Ohio law.) Rather, the discovery process is designed to test the truthfulness of the allegations in the Complaint, and the proper attack comes at the summary judgment stage. Accordingly, Plaintiffs have adequately pleaded a claim for breach of an implied contract.

*Brooks*, 732 F. Supp. 3d at 780.

In its Motion, OMA points the Court primarily to *Tate*. There, the court dismissed the plaintiff's unjust enrichment claim because the plaintiff failed to allege anything beyond legal conclusions:

> Plaintiffs allege that they and EyeMed entered into an implied contract "under which EyeMed agreed to safeguard and protect" Plaintiffs' PII. (Doc. 19, ¶ 149, #259). Beyond this threadbare allegation, Plaintiffs fail to allege any facts to support the claim that EyeMed agreed to provide data security as a condition of service—even tacitly. Simply stating that an implied contract existed is insufficient. *Iqbal*, 556 U.S. at 678. Thus, the Court finds the breach of implied contract claim implausible on its face.

*Tate*, 2023 U.S. Dist. LEXIS 175840 at *24.

Plaintiffs' allegations here certainly go beyond the "threadbare allegation[s]" in *Tate*. Plaintiffs allege that "[a]s a condition of receiving medical services from Defendant, Plaintiffs were required to provide their Private Information to Defendant, including at least their names, dates of birth, addresses, phone numbers, email addresses, and financial account information, as well as the fact that they sought Defendant's services for medical purposes." (Doc. No. 9, ¶ 36, *see also id.* at ¶¶ 63, 82, 100, 118, 136, 153, 171.) They further allege that "Defendant required Plaintiffs and Class

Members to provide, or authorize the transfer of, their Private Information for Defendant's clients to provide services." (*Id.* at 296.) They then allege that "Defendant solicited and invited Plaintiffs and Class Members to provide their Private Information as part of Defendant's regular business practices." (*Id.* at 297.) Plaintiffs also allege that OMA's Privacy Policy provides: "Ohio Medical Alliance uses reasonable and appropriate security measures to safeguard the information that has been collected from you via the public or Secure Website Services. Among the measures that Ohio Medical Alliance has implemented for its websites are administrative, physical and technical safeguards." (*Id.* at 33.)

Although not cited or relied upon by the parties to support their respective arguments regarding the plausibility of Plaintiffs' implied contract claims, the Court finds *Munger* directly on point. There, the Court found that the following allegation was sufficient to sustain an implied contract claim:

> As a condition of making purchases from Defendant, Plaintiffs and the Customer Subclass provided and entrusted their PII. In so doing, Plaintiffs and the Customer Subclass entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such PII, to keep such PII secure and confidential, and to timely and accurately notify Plaintiffs and the Customer Subclass if their PII had been compromised or stolen.

*Munger*, 2026 U.S. Dist. LEXIS 98633 at *24. And the Complaint here includes a nearly identical allegation:

> As a condition of being customers of Defendant, Plaintiffs and Class Members provided and entrusted their Private Information to Defendant. In so doing, Plaintiffs and Class Members entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such non-public information, to keep such information secure and confidential and to timely and accurately notify Plaintiffs and Class Members if their data had been breached and compromised or stolen.

(Doc. No. 9, ¶ 298.) The Court therefore declines to dismiss Plaintiffs' implied contract claim. *See*

*also Foster*, 493 F. Supp. 3d at 640–41 (finding similar allegations sufficient to sustain an implied contract claim).

**4. The Complaint alleges a plausible unjust enrichment claim**

In its Motion, OMA cites *Tate* for the proposition that "Plaintiffs cannot plausibly rely on OMA's website or privacy policy statements because unilateral statements of fact alleged as to the safety of a customers' data do not create contractual obligations." (Doc. No. 11, PageID #248.) In their Opposition, Plaintiffs point the Court to contrary authority in *Foster* and *Tucker*, where the Court sustained similar claims for unjust enrichment. (Doc. No. 12, PageID #280.) OMA argues in its Reply that "Plaintiffs rely on the Article to support their allegations, and the Article specifically states that the information the Trespasser accessed (none of which identifies Plaintiffs) will not be shared." (Doc. No. 13, PageID #13.)[10]

In *Tate*, the plaintiffs alleged that "they conferred a monetary benefit on EyeMed through payments for vision benefits." *Id.* at *25. The court reasoned that this allegation was insufficient to sustain an unjust enrichment claim because "a traditional exchange of payment for goods and services is not a circumstance in which it is 'unjust' to allow the defendant to retain the benefit" and "Plaintiffs got what they paid for—vision benefits." *Id.* Although not specifically relied upon by OMA, the court in *Brown* likewise found that plaintiffs could not sustain an unjust enrichment claim under either of their two theories (i) that the defendant "benefited from the receipt of Plaintiffs' PII" and (ii) "that the banking fees Plaintiffs paid were in exchange for PII protection." *Id.* at 782. As to the former, the

[10] OMA further argues, for the first time in its Reply, that "unjust enrichment is a quasi-contract claim, and for the reasons discussed above, Plaintiffs failed to allege any agreement between the parties, express or implied, regarding cybersecurity." (Doc. No. 13, PageID #299.) Again, this argument is waived. But regardless, whatever merit this argument may have, the Court has found that Plaintiffs have alleged a plausible implied contract. Thus, even if OMA had not waived this argument, it fails at this stage of the case.

Court reasoned that the defendant "benefited from the receipt of Plaintiffs' PII." *Id.* As to the latter, the court reasoned that "[t]he only plausible inference from the Complaint is that banking fees were paid for Limestone to maintain Plaintiffs' money in an account and to conduct financial transactions" and "Plaintiffs do not allege that they did not receive these services; rather, Plaintiffs allege they did not receive adequate data security." *Id.*

But in *Tucker* the court found the following allegations were sufficient to sustain an unjust enrichment claim: Plaintiffs "conferred a benefit on MHS by paying beyond what was owed for their medical treatment to ensure security of their private information; MHS knew that Plaintiffs paid this additional money for the security of their information; and MHS was enriched when it retained this additional payment without using it to secure Plaintiffs' information." *Tucker*, 2023 U.S. Dist. LEXIS 13974, at *19. And in *Foster v. Health Recovery Servs.*, 493 F. Supp. 3d 622, 641 (S.D. Ohio 2020) the Court concluded that plaintiff stated a claim for unjust enrichment by alleging that "he conferred a benefit on Defendant by paying Defendant for health care services pursuant to an implied contract which required Defendant to safeguard Plaintiff's sensitive medical information" and "that Defendant failed to safeguard this information but has retained the payment made by Plaintiff for those services." *Foster*, 493 F. Supp. 3d at 641. Likewise, in *Munger*, the Court reached the same conclusion. There, the plaintiffs alleged "that (1) they provided their PII to Defendant; (2) Defendant knew Plaintiffs' and class members' PII was a benefit, which Defendant accepted; and (3) Defendant failed to provide reasonable security, safeguards, and protections to the PI." *Id.* at *25. The plaintiffs further alleged that "retaining the PII was beneficial as it allowed Defendant to sell its products, employ people, and because the PII is valuable" and that "Defendant's lax security of the PII created a circumstance in which it would be unjust for Defendant to retain the benefit from the

PII without payment." *Id.* at *26.

Considering all of the above authority, the Court finds that the allegations here mirror those in *Foster*. As in that case, Plaintiffs allege here that they "conferred a monetary benefit on Defendant" by purchasing "services/goods from Defendant and/or its agents and in so doing provided Defendant or its agents with their Private Information." (Doc. No. 9, ¶ 319.) They further allege that "in exchange, Plaintiffs and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security." (*Id.*) Plaintiffs then allege that "Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted." (*Id.* at ¶ 320.) They further allege that "Defendant was enriched by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information" because it "calculated to avoid the data security obligations at the expense of Plaintiffs and the Class by utilizing cheaper, ineffective security measures." (*Id.* at ¶ 322.) As in *Foster*, the Court finds that these allegations establish a plausible unjust enrichment claim. And, unlike in *Tate* and in *Brown*, Plaintiffs allege more than just payment for services.

The Court is not persuaded by OMA's attempt to distinguish *Foster*. OMA argues that *Foster* is distinguishable because "Plaintiffs rely on the Article to support their allegations, and the Article specifically states that the information the Trespasser accessed (none of which identifies Plaintiffs) will not be shared." (Doc. No. 13, PageID #299.) But as the Court has already found, the Complaint sufficiently alleges that Plaintiffs' private information was accessed by someone other than the "Trespasser."

For all these reasons, the Court declines to dismiss Plaintiffs' unjust enrichment claim.

**5. The Complaint alleges a plausible invasion of privacy claim.**

In its Motion, with respect to Plaintiffs' invasion of privacy claim, OMA points the Court to *CBIZ* where the Court held that PII "may be personal and protectable, in that it provides information to verify a person's identity, but it is not private in the sense that its disclosure would cause offense, mental suffering, shame, humiliation to a person of ordinary sensibilities." (Doc. No. 11, PageID #249.)

Plaintiffs respond in their Opposition that "Ohio courts recognize that disclosure of Social Security numbers on the internet causes a privacy injury under Ohio law" and that "[f]ederal courts have concluded similarly as to Social Security and driver's license numbers, both of which were implicated here." (Doc. No. 12, PageID #272.) Plaintiffs further argue that they "also suffered privacy injuries because OMA publicized their medical history and status as medical marijuana patients." (*Id.*)

In its Reply, OMA argues that "there is no factual allegation of acquisition or exposure – only that OMA possessed Plaintiffs' information, therefore it could have been in the subject database, and the Trespasser could have accessed it." (Doc. No. 13, PageID #295.) It further argues that "Plaintiffs do not allege any of their Social Security numbers were found posted on the dark web or exposed elsewhere." (*Id.*)

"In Ohio, invasion of privacy involves four distinct torts: '(1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing private facts about the plaintiff; (3) publicity which places the plaintiff in a false light in the public eye; and (4) appropriation, for the defendant's advantage, of the plaintiff's name or likeness.'" *Grand v. City of Univ. Heights*, No. 1:22-cv-1594, 2024 U.S. Dist. LEXIS 176340, at *43 (N.D. Ohio Sept. 30, 2024)

(citing cases). Plaintiffs' invasion of privacy claim falls in the second of these torts. The elements of a public disclosure claim are "(1) a clearly private fact; (2) public disclosure of the private fact; and (3) a showing that the matter made public is one which would be highly offensive and objectionable to a reasonable person." *Brit Ins. Holdings N.V. v. Krantz*, No. 1:11 CV 948, 2012 U.S. Dist. LEXIS 1398, at *27 (N.D. Ohio Jan. 5, 2012) (citing *Greenwood v. Taft, Stettinius and Hollister*, 663 N.E.2d 1030 (Ohio App. 1st Dist. 1995)). "The private fact at issue must concern the private life of the plaintiff, not his public life." *CBIZ*, 2025 U.S. Dist. LEXIS 103815 at *26 (citing *Killilea v. Sears, Roebuck & Co.*, 499 N.E.2d 1291 (Ohio App. 10th Dist. 1985)).

OMA relies on *CBIZ* in its Motion to attack only the first element of the public disclosure tort claim (e.g. that the facts disclosed are "private"). In *CBIZ*, the court found that "Plaintiffs' PII does not clearly satisfy the definition of a 'private fact' under the elements of a claim for invasion of privacy" because "it is not private in the sense that its disclosure would cause offense, mental suffering, shame, humiliation to a person of ordinary sensibilities." *Id.* at *27. The Court further reasoned that "[t]hough there is a financial risk attendant to its unauthorized disclosure, it is typically disclosed by its owners in a multitude of financial and identification scenarios without fear, offense, or suffering, and it is required to be disclosed in order to obtain numerous necessary benefits from filing taxes to obtaining health care." *Id.*[11]

Plaintiffs respond with citing several decisions that, while not involving the tort of invasion

[11] The Court then found that "[e]ven if the PII at issue did constitute the type of private information that the tort of invasion of privacy is meant to protect, Plaintiffs do not plausibly allege that the Defendant disclosed this information to the public." *Id.* at *28–29. The Court reasoned that although their information was obtained from a vulnerable database, the plaintiffs did not allege that "CBIZ, itself, disclosed the information to any third party, nor is there any allegation that the information on the database was, or is, accessible to the general public." *Id.* at *29. OMA does not argue here that Plaintiffs' invasion of privacy claim fails on this basis.

of privacy, recognize that the disclosure of Social Security numbers constitutes a privacy injury. *Allen*, 696 F. Supp. 3d at 436 (finding disclosure of social security numbers a concrete harm sufficient to confer Article III standing); *Short v. Ohio Dep't of Job & Fam. Servs.*, 271 N.E.3d 351, 367 (Ohio App. 10th 2025) (finding, in the context of an Ohio law standing analysis, that "the acquisition and exposure of the class members' personal information by cybercriminals" bore "a close relationship to a common law claim for invasion of privacy"); *see also Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 425 (4th Cir. 2025) ("we hold that the public disclosure of private information tort makes concrete the intangible harm suffered when information that the plaintiff would justifiably prefer to tightly control is released into the open"); *Bohnak v. Marsh & McLennon Cos.*, 79 F.4th 276, 286 (2d Cir. 2023) (finding that "[t]he core of the injury Bohnak alleges here is that she has been harmed by the exposure of her private information—including her SSN and other PII—to an unauthorized malevolent actor," which was sufficient to establish Article III standing).

Plaintiffs then point the court to *Herman v. Kratche*, No. 86697, 2006 Ohio App. LEXIS 5895, at *17 (Ohio App. 8th Dist. Nov. 9, 2006). There, the Court reversed summary judgment in favor of the Cleveland Clinic on the plaintiff's invasion of privacy claim. Relevant to the Court's decision today, the *Herman* court concluded that "[w]hen [the Cleveland Clinic] mistakenly mailed plaintiff's information to Nestle, the Clinic wrongfully intruded into plaintiff's private life." *Id.* The *Herman* court also found that that there was a genuine issue of material fact as to whether this disclosure "would cause a person of ordinary sensibilities outrage, mental suffering, shame, or humiliation." *Id.* Plaintiffs also direct the Court's attention to a decision from the Ohio Court of Common Pleas that permitted an invasion of privacy claim to proceed based on disclosure of medical PHI. *See In re The Christ Hosp. Pixel Litigation*, No. A2204749, 2024 WL 4476613, at *2 (Ohio C.P. Oct. 8, 2024)

(denying motion to dismiss invasion of privacy claim based on allegations that "Plaintiffs' online engagement with their healthcare provider was allegedly disclosed to third parties," which "included the substance of searches for medical conditions that Plaintiffs submitted on Defendant's website, Plaintiffs' access to medical records, and scheduling of medical appointments").

Other than these cases, there does not appear to be much Ohio authority,[12] other than what Plaintiffs cite in their Opposition, on whether disclosure of medical information is sufficient to sustain an invasion of privacy claim. Some courts outside of Ohio "have refused to dismiss invasion of privacy claims at the motion to dismiss stage where, as here, a data breach involved medical information, because the disclosure of such information is more likely to constitute an 'egregious breach of the social norms' that is 'highly offensive.'" *In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1143 (C.D. Cal. 2021) (citing *Statsi v. Inmediata Health Grp. Corp.*, 501 F. Supp. 3d 898, 926 (S.D. Cal. 2020); *Doe v. Beard*, 63 F. Supp. 3d 1159, 1170 (C.D. Cal. 2014)).

The Court finds, at this stage, that dismissal is inappropriate. OMA bases its argument solely on the argument that, under *CBIZ*, disclosing PII is insufficient to sustain an invasion of privacy claim under Ohio law. But Plaintiffs are correct that *CBIZ* did not involve medical information and there is authority supporting the argument that disclosure of medical information could sustain an invasion of privacy claim under Ohio law. To be sure, OMA is free to revisit this issue on summary judgment and develop its arguments further. But its four-sentence argument on the narrow issue of whether disclosure of PII is sufficient to sustain an invasion of privacy claim is not sufficient. For these reasons, the Court declines to dismiss Plaintiffs' invasion of privacy claim.

---

[12] This is likely because "[i]n Ohio, an independent tort exists for the unauthorized, unprivileged disclosure to a third party of nonpublic medical information that a physician or hospital has learned within a physician-patient relationship." *Biddle v. Warren Gen. Hosp.*, 715 N.E.2d 518, paragraph 1 of the syllabus (Ohio 1999).

**6. The Complaint alleges a plausible claim for declaratory judgment**

OMA argues that "'claims' for declaratory and injunctive relief are not valid standalone claims on which the Complaint can survive absent a viable predicate claim, which as explained above, Plaintiffs fail to state." (Doc. No. 11, PageID #249.) Plaintiffs respond in their Opposition that "Plaintiffs have established that their underlying legal claims are viable" and that "declaratory judgment is necessary to provide Plaintiffs with complete relief." (Doc. No. 12, PageID #280.) In their Reply, Defendants again argue that "Plaintiffs have not adequately alleged their information was present in the subject database, or that it was disclosed to the Trespasser" and that "[d]eclaratory judgment is a remedy, not a cause of action, and Plaintiffs have not alleged any cause of action for which a remedy is warranted." (Doc. No. 13, PageID #299.) As explained above, Plaintiffs have sufficiently alleged that their information was in the subject database and that they have viable causes of action. The Court, accordingly, declines to dismiss Plaintiffs' declaratory judgment claim.

## V. Conclusion

For the following reasons, OMA's Motion to Dismiss is DENIED.

**IT IS SO ORDERED.**

*s/Pamela A. Barker*
PAMELA A. BARKER
U. S. DISTRICT JUDGE

Date: September 8, 2026